**James COOKE, Defendant Below–Appellant,**

v.

**STATE of Delaware, Plaintiff Below–Appellee.**

Nos. 289 & 324, 2007.

Supreme Court of Delaware.

Submitted: April 8, 2009.
Decided: July 21, 2009.

---

**12.** *Id.* at 210.

**13.** *Id.* at 211.

Jennifer Kate Aronson, Esquire (argued) and Joseph A. Gabay, Esquire (argued), Wilmington, Delaware, for appellant.

Paul R. Wallace, Esquire (argued), Loren C. Meyers, Esquire, Steven P. Wood, Esquire, Gregory E. Smith, Esquire, Danielle J. Brennan, Esquire of the Department of Justice, Wilmington, Delaware, for appellee.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS, and RIDGELY, Justices, constituting the Court en Banc.

RIDGELY, Justice, for the Majority.

In this capital case, we address whether defense counsel may introduce evidence

incriminating their client at the guilt/innocence phase and then argue that a competent defendant is "guilty but mentally ill" of the crimes charged when the defendant expressly objects to this strategy, asserts his factual innocence, denies mental illness, and so testifies before the jury. We also address whether the trial judge, in these extraordinary circumstances, may choose not to intervene when the conflict between defense counsel and the defendant over the objectives of the representation so plainly appears and the defendant testifies that he has "fired" his attorneys and "I'm defending my own self." We conclude that defense counsel's strategy infringed upon the defendant's personal and fundamental constitutional rights to plead not guilty, to testify in his own defense, and to have the contested issue of guilt beyond a reasonable doubt decided by an impartial jury. Defense counsel's conduct in this case, and the trial court's refusal to intervene and provide a remedy, so undermined the proper functioning of the adversarial process contemplated by the Sixth Amendment and the Due Process Clause that the trial cannot be relied upon as having produced a just result. Accordingly, we must reverse the judgment of the Superior Court and remand for a new trial.

## I. The Issues on Appeal.

Defendant–Appellant James Cooke appeals from his Superior Court convictions of eleven charges, including rape in the first degree, burglary in the first degree, arson in the first degree, and two counts of murder in the first degree, which resulted in a sentence of death.[1] Nine claims of error are before us. First, Cooke claims that the trial court violated his right to due process and right to counsel guaranteed by the United States and Delaware Constitutions when it permitted defense counsel to argue that Cooke was "guilty but mentally ill" over his express objection and despite his plea of "not guilty." Second, he contends that the court violated his Sixth Amendment right by failing to inquire sufficiently and timely into the actual conflict of interest and/or irreconcilable conflict that existed between Cooke and his trial counsel. Third, he argues that it was plain error for the court to admit psychiatric evidence and instruct the jury on the alternative verdict of "guilty but mentally ill" in the absence of an affirmative defense of "not guilty by reason of insanity." Fourth, he claims that the court erred in finding that antisocial personality disorder is "exempted" as a mental illness that serves as a basis for a finding of "guilty but mentally ill." Fifth, he urges that the court's jury instruction on "guilty but mentally ill" failed to require that the State prove by a preponderance of the evidence that Cooke suffered from antisocial personality disorder. Sixth, Cooke contends that he was denied a fair penalty hearing as a result of prosecutorial misconduct. Seventh, he argues that Title 11, Section 4209 of the Delaware Code is unconstitutional, because it is overly inclusive and does not require a finding by the jury that the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt. Eighth, he claims that the court erred in denying his motion to suppress evidence related to the search of his residence. Ninth, he claims that his death sentence is not proportionate to the penalty imposed in similar cases.

We find merit to Cooke's first and second claims under the Sixth Amendment. His remaining claims are therefore moot, with the exception of his eighth claim, which we find lacks merit.

---

1. Cooke was also convicted of reckless endangering in the first degree, robbery in the second degree, two counts of burglary in the second degree, and two counts of misdemeanor theft.

## II. Facts and Procedural History

### A. *The Crimes: Harmon, Cuadra, and Bonistall.*

On April 26, 2005, at approximately 11:30 p.m., Cheryl Harmon returned to her apartment in the Towne Court Apartments in Newark. When she entered her apartment, she noticed bright red writing on her front living room wall and noted a strong odor of fingernail polish. Written on the living room wall was the statement "We'll be back." The statement "I what [sic] my drug money" was written on the bathroom wall, and the statement "Stop messing with my men" was written on the bedroom door. A living room window, previously locked, had been pried open to gain entry. Various items were also missing from her apartment, including two rings engraved with Harmon's name. Harmon called the police, who arrived soon after. However, there were no immediate suspects.

On April 29, 2005, Amalia Cuadra awoke in her Newark home to someone standing in her bedroom shining a light in her face. Thinking it was her roommate, Cuadra called out: "Carolina." In response she heard: "Shut the fuck up or I'll kill you; I know you have money." Cuadra, who was wearing only a t-shirt and underwear, got out of bed, wrapped herself in a blanket, and gave the person $45 from her wallet. She was also able to press 911 on her cell phone, but did not press "send." The person then demanded: "Give me your fucking credit cards or I'll kill you," and then "Take off your fucking clothes or I'll kill you." Cuadra screamed "Carolina" three times. As she screamed, the person apparently also saw the cell phone screen displaying "911" and fled, taking several items, including Cuadra's iPod, a backpack with her name tag, her credit card, and diet pills in a tin container. After the man left, Cuadra called 911. She described the intruder as a light skinned black male with bumps or freckles on his face, wearing a gray hooded sweatshirt, a hat, gloves, and light blue pants. Again, however, there were no immediate suspects.

On May 1, 2005, at about 1 a.m., Lindsey Bonistall, a twenty-year-old student at the University of Delaware, returned to her apartment in the Towne Court Apartments. Shortly thereafter, an intruder burglarized her apartment, entering through a sliding door that led from a balcony into her living room. The intruder eventually encountered Bonistall and attacked her in her bedroom. He beat Bonistall, striking her on the head at least twice above her left eye and on her chin. The intruder then used an iron cord to bind Bonistall's hands behind her back. Using her own t-shirts, the intruder further bound his victim. One t-shirt was knotted and shoved forcibly into her mouth as a gag. It was so tight that teeth marks were still visible when the gag was introduced at trial almost two years later. The intruder then knotted another t-shirt, which he used as a ligature to strangle Bonistall. Bonistall suffered severe bruising on her chest, consistent with someone kneeling on her, which likely occurred when the intruder was tightening the t-shirt-turned-noose. The intruder then raped Bonistall and strangled her to death.

It is likely that Bonistall was killed in her bed. Then, in an apparent attempt to eliminate evidence of his crime, after raping and strangling her to death, the intruder took a bottle of bleach from Bonistall's closet and doused her dead body with bleach while she was still in her bed. He then dragged Bonistall's still bound body to the bathroom, placed her facedown in the bathtub, piled pillows, a wicker basket, and a guitar on top of Bonistall's body, and lit a fire. Although portions of her body were badly burned, Bonistall was dead before the fire started.

Continuing his attempt to conceal the true nature of his crime, at some point while he was still in the apartment, but before starting the fire, the intruder wrote on the walls and countertops of Bonistall's apartment in blue marker. Written on the interior surface of the front door and on a closet door directly across from it, was the statement "KKK." The statements "More Bodies Are going to be turn in [sic] up Dead," "We Want Are [sic] weed back," and "Give us Are [sic] drugs back" were written on the living room wall, and the statements "WHITE Power" and "KKK" appeared in the kitchen.

At approximately 3 a.m., shortly after Bonistall was murdered, the fire the intruder started in the bathtub awakened local residents, who called the local fire department. Late that morning, the fire marshal investigating the scene discovered Bonistall's body lying face-down in the melted, burnt bathtub. Portions of the walls above the bathtub had collapsed around her body as a result of the fire, and the tub had to be broken apart in order for Bonistall's body to be removed.

B. *The Investigation.*

Early in the morning of April 29, two days before Bonistall was murdered, Cooke returned to his residence at 9 Lincoln Drive in Newark, where he lived with his girlfriend, Rochelle Campbell.[2] Campbell noticed a panty liner and a backpack which she did not recognize. The backpack contained an iPod, a tin-looking container, and a name tag with a "Spanish" name on it. She asked Cooke where he got the backpack and he said he had taken it from some college students who had gotten into a car accident outside the house and left it on the curb. He then showed Campbell the credit cards, dis-

cussed trying to use them at a nearby ATM, and left.

On May 2, JP Morgan Chase determined that someone had attempted to use Cuadra's stolen credit card at an ATM located at 211 Elkton Road at 4:19 a.m. on April 29. The ATM is approximately a half mile from Cooke's residence. From the ATM surveillance tape, police recovered still photographs showing a man at the ATM wearing a grey hooded sweatshirt and wool gloves. Within a day or two, Cuadra was shown one of the photographs from the ATM and was "pretty sure" that the man depicted was the intruder in her bedroom. From Cuadra's description, police created a composite sketch, which they published in a "wanted" poster. Police also created a second "wanted" poster from the ATM photographs. Cooke was identified as the man in the photos by co-workers, neighbors, and Campbell.

Following Bonistall's murder, Cooke made three phone calls to the Newark 911 call center, during which he gave a false name and attempted to disguise his voice. The first call occurred on May 2, the day after the murder; he then called twice on May 7, at one point speaking with Detective Andrew Rubin, the chief homicide investigator. Cooke claimed to have knowledge of Bonistall's murder and used the names of the home invasion victims, Harmon and Cuadra. He gave the police details about the three crimes that had not been previously released to the public, including a specific pronunciation of Cuadra's roommate's name, that "KKK" had been written on the walls of Bonistall's apartment, and that Bonistall had been bound. Campbell testified at trial that the voice in the calls was Cooke's.

**2.** At the time, Campbell had had three children together and was pregnant and due in June with the fourth. She had known Cooke for about ten years.

Police performed a handwriting analysis on the writing on the walls in both Bonistall's and Harmon's apartments, which confirmed that Cooke could have written all the statements. Police also conducted forensic testing at the crime scenes. Analysis on scrapings recovered from Bonistall's fingernails revealed a mixture of Bonistall's and Cooke's DNA. Analysis of DNA recovered from Bonistall's vaginal area was also consistent with Cooke's DNA profile.

## C. *The Trial.*

Cooke was arrested in Delaware on June 8, 2005, and indicted by a grand jury for murder in the first degree (Bonistall), rape in the first degree (Bonistall), felony murder in the first degree (murder during the rape of Bonistall), burglary in the first degree (Bonistall's apartment), arson in the first degree (Bonistall's apartment), reckless endangering in the first degree (the fire in Bonistall's apartment), burglary in the second degree (Cuadra's apartment); robbery in the second degree (Cuadra), misdemeanor theft (Cuadra), burglary in the second degree (Harmon's apartment), and misdemeanor theft (Harmon). The State sought the death penalty on each of the murder counts.[3] On August 9, Cooke entered a not guilty plea and demanded a jury trial. Cooke was represented by attorneys from the Office of the Public Defender. Trial was scheduled to begin February 2, 2007.

### 1. *Defense counsel chooses to pursue a verdict of guilty but mentally ill.*

Defense counsel began considering seeking a verdict of "guilty but mentally ill" as early as September 2005. In October 2005, they informed the trial judge and the prosecution that the defense expected to pursue the verdict. Defense counsel were aware that Cooke did not agree with this decision at least as early as October 2006, when they gave Cooke a memorandum explaining that they believed the decision to pursue a guilty but mentally ill verdict was for counsel, and not for the defendant, to make. Cooke asserted that he was innocent and not mentally ill.

### 2. *Pre-trial conferences indicate a rift between Cooke and trial counsel.*

Defense counsel first informed the trial judge that Cooke did not agree with their decision to seek a guilty but mentally ill verdict during an office conference to discuss jury selection and scheduling matters on January 19, 2007. At the end of the conference, when they finished discussing jury selection and scheduling matters, the trial judge asked whether the State or defense had any other issues they wished to raise. Defense counsel answered in the affirmative and explained that Cooke did not agree with their decision about how to best defend the case. Defense counsel wanted to assert that Cooke was guilty but mentally ill, while Cooke wished to maintain his factual innocence and did not want his counsel to present evidence that he was mentally ill. Defense counsel explained the issue as follows:

> Well, there's probably something we should bring up and Mr. Cooke and co-counsel and I have talked about it at length.
>
> \* \* \*
>
> It may come to a head, it may not. Mr. Cooke has one idea about how to

---

**3.** The State relied on the aggravating factor in Title 11, section 4209(e)(1)j, which allows for the death penalty if "[t]he murder was committed while the defendant was engaged in the commission of, or attempt to commit, or flight after committing or attempting to commit any degree of rape, unlawful sexual intercourse, arson, kidnapping, robbery, sodomy or burglary."

defend this case; his counsel has a different idea. And in counsel's view, Mr. Cooke's intended course of defense has little chance for success and will likely increase his chances for conviction and likely a death sentence. We have talked at length, counsel and Mr. Cooke, and to date we have essentially agreed to disagree; and I have written him at length and explained to him that in counsel's view, based on the case law in Delaware, it is his lawyer's discretion whether to present a particular defense—well, I should start again. I have explained, and I'll submit at some point what I have—or at least a summary of what I have written to Mr. Cooke explaining that if the decision is the purpose of the litigation then the decision rests with Mr. Cooke about what to do. However, if the decision pertains to trial tactics and strategy, it is his counsel's decision what to do. That's with respect to the first phase of the case. Assuming we're facing then the second phase of a case, a penalty phase, I have written to Mr. Cooke and given him my opinion that based on the *Ashley* opinion of Judge Carpenter that the presentation of a mitigation case is in the discretion of trial counsel. Although there have been circumstances where defendant's decision to waive mitigation evidence has been accepted.

\* \* \*

[Co-counsel] and I have the view that we can't present a claim of guilty but mentally ill without having to renounce innocence; that Mr. Cooke can maintain his innocence, as he may do if he chooses to testify, yet we will be able to present, on his behalf, a claim of guilty but mentally ill. And so there is going to be, I think, at some point probably before we begin the evidence and make opening statements where we are going to need to go on the record and hash this out on the record, and go forward from there.

\* \* \*

So that's where we are right now with respect to Mr. Cooke and what's likely to be forthcoming.

Although this was the first time the trial judge learned about the disagreement between Cooke and his counsel, it is evident from the transcript that the State was aware of the disagreement prior to the conference. First, earlier in the conference, the State argued to the trial judge that if the defense was to decide prior to opening arguments that it intended to seek a guilty but mentally ill verdict, then the defense must inform the State pre-trial so that the State could draft its opening arguments accordingly. Defense counsel declined to comment at that time.[4] Second, after defense counsel told the trial judge about the disagreement, the prosecutor stated that he was grateful that defense counsel had raised the issue and explained that he had already discussed the issue with the State's Appellate Division. The

---

4. The discussion went as follows:

**The State:** So I suppose I am asking if Your Honor agrees with that analysis for the defense to let us know at some point what it is going to do in its opening so we can proceed accordingly.

**The Court:** Interesting question. Do you care to respond in any way at this point? I'm not requiring you to necessarily, but whatever you want to say.

**Defense Counsel:** No thank you at this moment. I don't care to respond at this moment, given that option. For once I'm going to shut my mouth.

**The Court:** Okay. We will take this up in connection with the preliminary instructions at the latest before [ ] we start the trial.... That's not saying necessarily it will be resolved by that point, but at least from the point of view of opening.

prosecutor summarized the issue as follows: "[I]f the defendant maintains his factual innocence, can counsel, nonetheless, argue that he is guilty of the charged offense but mentally ill?"

The trial judge shared his concern by stating: "I don't know how you can argue something that has the word 'guilty' in it when the defendant doesn't want you to, because it's guilty as charged, not guilty of the lesser-included offense."

It is also apparent from the transcript that Cooke had disclosed his disagreement with counsel during his interviews with psychiatrists. During an interview with Dr. Alvin Turner, a psychologist who later testified for the defense, Cooke admitted and also denied, the crimes, but repeatedly stated that he did not agree with the mental illness evidence his counsel wanted to present at trial because he was not guilty and not mentally ill. The prosecutor, who had read the doctors' reports produced during discovery, explained to the trial judge that, "according to Dr. Turner's report, the defendant admitted murdering Ms. Bonistall and then denied it. What he told Dr. Mechanick is that he never told Dr. Turner he killed Lindsey Bonistall . . . but this mentally ill stuff is all garbage and he's sane."

Defense counsel knew that Cooke wanted to maintain his factual innocence. Defense counsel explained that they believed that Cooke was "certainly entitled under the law to testify in any way he deems

appropriate" and that Cooke would likely testify that "he had consensual sex with Lindsey Bonistall, he left and after that she must have been murdered by somebody else. I know nothing about it." But, defense counsel also explained they felt that they could not in good faith make the same argument. In their view, "that does not preclude counsel from pursuing a claim of guilty but mentally ill." Finally, defense counsel explained that they were bringing up the issue at the pre-trial conference because they thought that the trial judge needed to engage in a colloquy with Cooke and address the disagreement on the record prior to trial. Defense counsel was concerned that failure to address the disagreement prior to trial might result in "some kind of disastrous happening during trial," such as an outburst by Cooke.[5]

The disagreement between Cooke and his counsel was brought to the trial judge's attention for a second time on January 22, 2007, during an office conference the day before jury selection was to begin. Defense counsel gave the trial judge and the State a copy of a memorandum that they had given to Cooke in October 2006. The memorandum discussed the disagreement between Cooke and his counsel and whether his counsel could present evidence to support a guilty but mentally ill verdict despite Cooke's objection.[6] The trial judge had not yet researched the issue, but noted that the law was not clear on how to resolve the disagreement. He also

5. The discussion went as follows:
 **Defense Counsel:** "I think we need to address it legally before opening statements and submit something in writing to the Court and put Mr. Cooke before the Court and address it on the record. I think doing anything other than that, we're inviting some kind of disastrous happening during trial."
 **The Court:** Like an outburst or something of that nature, possibly?
 **Defense Counsel:** Yeah.

6. Defense counsel explained:
 It's really the defense position that—and we advised Mr. Cooke of this—it is his counsel's position that counsel can present both a defense in the guilt/not guilt phase of the trial and mitigation evidence in the penalty phase, should there be a penalty phase, and this is an effort to outline the defense position on why we should be able to do that, notwithstanding his desire otherwise.

noted that the unsettled state of the law was probably the reason why defense counsel had asked him to engage in a colloquy with Cooke before the trial began.

Defense counsel said they believed that Cooke had a mental illness and that his decision to waive a defense of mental illness should be "very carefully scrutinized." The prosecutor pointed out that all of the psychiatric/psychological experts had determined that Cooke was competent to stand trial, meaning that he could make legal decisions. The prosecutor explained that if defense counsel decided to introduce evidence to support a guilty but mentally ill verdict, despite Cooke's objections, then defense counsel would be suggesting to the jury that Cooke's preferred defense of innocence was not valid. The prosecutor said that "it would get particularly knotty, I suppose, if the defendant were to testify and say, 'I did not kill Lindsey Bonistall,' and defense were to then present psychiatric or psychological testimony from Dr. Turner, which, among other things, includes the defendant's admission that he did kill Lindsey Bonistall."

These exchanges in the record demonstrate that the trial judge was made aware that Cooke wanted to maintain his innocence but that his counsel, not the State, was considering admitting evidence that Cooke confessed to the crime. The trial judge concluded that he would probably hold a colloquy with Cooke after the jury was selected and before the start of evidence. The State requested that the trial judge hold the colloquy before opening statements. The trial judge did not make a decision about when exactly he would hold the colloquy.

### 3. *Jury Selection.*

On January 24, 2007, after the morning session of voir dire had concluded, the trial judge asked to talk to counsel outside the presence of Cooke. The trial judge wanted to raise the issue of whether Cooke needed to enter a plea of guilty to seek a guilty but mentally ill verdict. Defense counsel stated that they believed Cooke did not need to enter a plea of guilty to pursue a guilty but mentally ill verdict. The State agreed that the statute governing the guilty but mentally ill verdict requires the State to prove Cooke's guilt beyond a reasonable doubt and therefore does not require a guilty plea.

The State noted, however, that the relevant issue in Cooke's case "was more whether a defendant, who insists upon a verdict of 'not guilty' can have that choice in any way overridden by counsel." The trial judge acknowledged that he needed to address the issue. He noted that, even if he were to decide that defense counsel had to present evidence at trial to support the objective that Cooke choose—*i.e.,* that Cooke was not guilty—and could not present evidence to support a guilty but mentally ill verdict, the inquiry would not end there because the issue would come up again in the penalty phase, if there was one. The trial judge stated: "I'm just saying that the tangled web we're weaving continues to weave." The discussion concluded because the trial judge did not want to have argument on the issue at that time; he was simply pointing out potential issues for the parties to consider.

On January 26, after the afternoon session of voir dire concluded, the State requested that the trial judge engage in a colloquy with Cooke as soon as possible, rather than delay addressing the issue of whether defense counsel could pursue a guilty but mentally ill verdict despite Cooke's objections. The State stated that it was considering certifying a question to this Court for an opinion as to whether Cooke or his counsel had the right to decide whether or not to pursue a verdict of guilty but mentally ill as opposed to not

guilty; and further suggested that it might seek a writ of mandamus to forbid the trial judge from permitting defense counsel to present evidence to support a guilty but mentally ill verdict over Cooke's objections. The trial judge stated that he had not yet decided whether it would be appropriate to have a colloquy with Cooke before trial to discuss the disagreement.

The next day, the State sent defense counsel an email discussing the issue of who controls the defense's objective in the case. Defense counsel responded on January 28. Defense counsel also emailed the trial judge and stated that they objected to the trial judge holding a colloquy with Cooke about the disagreement, even though defense counsel originally had requested the colloquy.

On January 29, before voir dire began for the morning, the State renewed its request for the trial judge to engage in a colloquy with Cooke to determine whether or not Cooke still disagreed with his attorneys about their decision to pursue a guilty but mentally ill verdict and, if he still disagreed, whether or not Cooke's attorneys could pursue a guilty but mentally ill verdict despite Cooke's objections. The trial judge declined to decide whether or not to hold a colloquy. He wanted to continue with jury selection. The State asked whether a colloquy was "still a possibility," "at some point" and the trial judge said: "Maybe."

On January 30, the State moved *in limine* for an order to preclude defense counsel from presenting evidence to support a guilty but mentally ill verdict or any other evidence of mental illness unless either: (1) defense counsel informed the trial judge that there was no longer a dispute with Cooke about whether to pursue the verdict and that Cooke agreed with the presentation of evidence to support the verdict, or (2) the trial judge engaged in a colloquy with Cooke and determined that

Cooke agreed with his counsel's decision to seek a guilty but mentally ill verdict. In an email to the trial judge notifying him of the State's intent to make the motion, the prosecutor explained that "the ultimate choice of whether or not to pursue a guilty but mentally ill verdict is the defendant's to make, and that counsel cannot override that choice when (as is the case here) it is expressly communicated to them by a competent client." While making the motion, the prosecutor stated: "[W]e have a client who is communicative with counsel and has expressly said, after getting the best possible legal advice from two esteemed members of the defense bar, that he does not want to present a guilty but mentally ill defense." In addition, "the defendant's confession, if it be such, only comes into evidence through the guilty but mentally ill defense expert witness, Dr. Turner." Therefore, the prosecutor explained that the issue needed to be fleshed out before opening statements, where defense counsel would likely mention Cooke's mental illness.

Defense counsel disagreed with the State's position. They explained that they only brought the dispute to the trial court's attention because defense counsel wanted to avoid "any mid-trial surprises." Defense counsel stated: "It was not brought as an invitation to the State to attempt to have this Court dictate to counsel what counsel can say to the jury in opening statements." Defense counsel was concerned that if the trial judge granted the State's motion, it would have the result that "a man that counsel believes has mental illness [would make] a decision about whether to present evidence of that mental illness." Further, defense counsel noted that Cooke was not proceeding *pro se*. He wanted to have lawyers represent him. Defense counsel stated:

We're not conceding guilt here. We're going to challenge every shred of

evidence, if appropriate, if we think it's appropriate in helping Mr. Cooke's defense. We're going to fight for him in that respect. We're not conceding guilt, but also, we're not being unrealistic. We're going to put the State to its proof. And we're going to present evidence of Mr. Cooke's mental illness.

And at this juncture, to tell his lawyers, "You can't say that," to me looks like a guaranteed reversal. Now, I'm not really an appellate lawyer, but I've been doing this business a long time. I have never, from when I was a prosecutor or a defense lawyer, ever seen a situation where the judge is telling the defense lawyer, "Before you make your opening statement, you can't go there." You can't tell the jury what you expect to prove because you and your client aren't in "100 percent agreement." And I can tell you that [co-counsel] and I have made some progress in speaking with Mr. Cooke and that's all I'll say.

\* \* \*

[W]e have every expectation to believe that we will be presenting evidence of guilty but mentally ill, and Mr. Cooke may or may not be on board with us by the time we get there, but that doesn't mean we shouldn't get to tell the jury about it.

\* \* \*

And I'm going to tell this jury that we're going to present evidence of mental illness. I'm going to tell them it's up to them to decide whether the State has proven guilt.

At this point, Cooke said, "I've got to speak to the Judge." The record does not reflect that the trial judge or Cooke's counsel acknowledged Cooke's statement. Instead, the discussion between the trial judge, the State and defense counsel continued. The prosecutor again noted his

reservations about permitting Cooke's counsel to proceed with conceding guilt when Cooke claimed factual innocence. The prosecutor said:

So what the defense is saying is they want to present evidence of guilt in contravention to their client's wishes and in contravention in part to his testimony and desire to pursue a defense of factual innocence. [T]he best possible result of all of this would be to have your Honor engage in a colloquy or to have [defense counsel] say, "We've talked to James Cooke, he's changed his mind. He wants to go with a guilty but mentally ill defense."

The trial judge expressed three reservations about engaging in a colloquy with Cooke. First, he explained that defense counsel were no longer requesting a colloquy (even though they had originally requested it), and instead, were opposed to the trial judge engaging in a colloquy. Second, the trial judge was uncertain as to the ground rules for conducting such a colloquy, because there was no guiding case law, and he thought that an *in camera* colloquy with Cooke would be "totally inappropriate." Third, the trial judge acts as the ultimate sentencing authority and can only hear evidence that is presented to the jury, because the trial judge must make his decision based only on the evidence heard by the jury.

In addition, the trial judge thought he did not need to address the disagreement between Cooke and his counsel prior to opening statements, because the defense is not required to make an opening statement prior to the State's case-in-chief and can instead reserve the right to make an opening statement after the close of the State's case. Further, the State was not permitted to mention the potential presentation of evidence by the defense to support a guilty but mentally ill verdict be-

cause, in the State's opening statement, it is only permitted to address the evidence it will present in its case-in-chief—to mention the guilty but mentally ill evidence would constitute an argument and be inappropriate. The trial judge concluded that he was not going to do anything with regard to the dispute and would not hold a colloquy for the time being.

■ On January 31, the State informed the trial judge via fax that it would seek a writ of mandamus from this Court, asking this Court: (1) to review the trial judge's decision to deny the State's motion *in limine* to engage in a colloquy with Cooke or forbid defense counsel from seeking a guilty but mentally ill verdict and (2) to answer the question of whether Cooke's attorneys could seek such a verdict despite Cooke's objections.[7]

On February 1, the day before trial was to commence, the trial judge met with the parties and determined that they would proceed to trial while the writ was pending. The trial judge also reminded defense counsel to advise Cooke "that it is not in his interest to be demonstrative during the trial while the jury's in the courtroom." The trial judge was referring to Cooke's statement, "I've got to speak to the Judge," made during the January 30 discussion about whether Cooke's attorneys could present evidence to support a guilty but mentally ill verdict if Cooke objected and maintained his factual innocence.[8] Defense counsel said they had already advised Cooke that "his best interests are served by behaving appropriately" after he made the statement in court and they would advise him again before trial and continue to so advise him.

### 4. State's Case–in–Chief.

Trial began on February 2, 2007. During the preliminary instructions to the jury, the trial judge explained that "[i]t is improper for an attorney to state an opinion as to ... whether the defendant is guilty or not guilty." The trial judge also explained that "[w]hat an attorney thinks or believes about the evidence or the credibility of a witness in a case is absolutely irrelevant and you are instructed to disregard any personal opinion or belief which an attorney offers during opening or closing statements or any other time during the course of the trial." The prosecutor then gave his opening statement.

When the prosecutor was finished and the trial judge excused the jury for a

---

7. In criminal cases, only final judgments may be appealed to this Court. Del. Const. art. IV, § 11; *Stevenson v. State*, 840 A.2d 594 (Del. 2003). Even so, the State asked this Court to determine pre-trial whether, "in the event of an irreconcilable disagreement between defense counsel and the defendant about a decision to seek a verdict of guilty but mentally ill, ... the defendant's wishes prevail," and, if so, to direct the Superior Court to preclude Cooke's defense attorneys from presenting evidence that would support a verdict of guilty but mentally ill. *In re Petition of State for a Writ of Mandamus*, 918 A.2d 1151, 1152–53, 1155 (Del.2007). We declined to reach the substantive issues of the petition, determining, instead, that "a writ of mandamus proceeding [was] not the proper procedural context in which to decide the issue." *Id.* at

1153. A writ of mandamus is an extraordinary remedy, which is only available when the petitioner has established a clear and indisputable right to performance of the duty in question, no other adequate legal remedy is available, and the trial court has arbitrarily failed or refused to perform its duty. *In re Bordley's Petition for a Writ of Mandamus*, 545 A.2d 619, 620 (Del.1988) (per curiam).

8. The trial judge said:

I don't intend to say anything at this point directly, but I would assume knowing the two of you and it encompasses a lot of good things that you'll probably, especially after Tuesday [January 30, 2007], have advised Mr. Cooke that it is not in his interest to be demonstrative during the trial while the jury's in the courtroom.

recess, defense counsel asked to approach the bench and told the trial judge that, during the prosecutor's opening remarks, "Mr. Cooke handed [defense counsel] a note that indicates that he would like to talk to the Judge, please." The trial judge asked defense counsel to ask Cooke what he wanted to speak to the judge about and defense counsel left the courtroom to meet with Cooke in the conference room behind the courtroom. Before they left, defense counsel said they thought that Cooke might want to enter a plea of guilty. But, when defense counsel returned from the meeting with Cooke, they explained that Cooke did not want to enter a plea of guilty. Cooke wanted to "address the Court." [9] Defense counsel also explained that, although Cooke might not necessarily "act out in the courtroom," Cooke's "level of agitation [wa]s rising" and that it would be best if the court addressed the matters with Cooke somewhere other than in the courtroom in the presence of the media and the public. Defense counsel explained, "I think that that has the possibility of making it into the paper and possibly tampering with the jury's judgment of this gentleman at this stage of the trial."

The trial judge agreed that if he spoke with Cooke, it should be somewhere other than in the courtroom but would have to remain a public proceeding nonetheless.[10] The trial judge concluded that he was obligated to let Cooke speak to him, "and it might be best if I did so sooner rather than later to let some of the steam off." The trial judge preferred to wait until after the defense's opening statement.

The trial judge's reason for waiting was that Cooke would have a chance to hear what his counsel said "to a jury in an open courtroom in a public setting" and could "factor that in." The trial judge wanted Cooke to have a chance to "hear his legal voice in the same context as he heard the State's legal voice."

The State contended that it was best if the trial judge spoke to Cooke as soon as possible, preferably before the defense's opening statement, because Cooke had wanted "to talk to [the trial judge] for a couple of days now and it would be better if we can control the timing and the place of that discussion to prevent him from simply blurting things out in ways that could prejudice the trial."

Defense counsel agreed with the trial judge that it made sense to conduct the colloquy after the defense's opening statement, but requested that the trial judge inform Cooke of that timeframe in open court. The trial judge told defense counsel that he would not address Cooke in open court prior to the defense's opening statement and that, instead, defense counsel should explain to Cooke that he would have a chance to address the judge after the opening statement. The trial judge wanted defense counsel to explain to Cooke that he wanted Cooke to hear what his attorneys had to say first.

Cooke had not had any outbursts during the State's opening statement, but had grumbled from time to time. The State asked defense counsel if they thought Cooke could make it through the defense's

---

**9.** Defense counsel explained that Cooke wanted to speak to the judge about "the theme of wanting the whole videotapes heard by the jury, that he feels that his constitutional rights have been deprived, that he feels that the prosecution in this case has racial motivation, that he feels that the Court isn't following the rules that it's supposed to follow or the Constitution."

**10.** The trial judge said:

> If I spoke to him, it would be in a situation where I would hope that we could preserve the proceedings in a way that they 'remain public' without drawing, if I can say this in the same breath, undue attention to him if you catch my drift because any proceeding has to be public.

opening statement without having an outburst and defense counsel said that they thought he could, although he might continue grumbling. Defense counsel stated: "I have indicated to him that his family supports what I'm intending to do and that may dissuade him to some extent, but I can't guarantee."

The statements made during that conversation suggest that defense counsel and the prosecutors knew that Cooke's outbursts were precipitated by his objection to the presentation of mental illness evidence. The State was very concerned that Cooke would have an outburst in court if the trial judge did not speak to Cooke before the defense's opening statement and before defense counsel mentioned Cooke's mental illness or a guilty but mentally ill verdict in its opening statement. The conference ended and defense counsel spoke with Cooke privately.

The jury was brought back into the courtroom. Defense counsel made the opening statement, which focused entirely on Cooke's mental illness and requested a verdict of guilty but mentally ill.[11] When the defense concluded its opening statement, the trial judge excused the jury and the public and announced that proceedings would continue following the lunch recess.

Prior to the resumption of the trial, the trial judge met with the prosecutor, defense counsel, Cooke, and a court reporter in a separate courtroom. The trial judge told Cooke that he had the opportunity to speak about his concerns. Cooke said that he would prefer to speak in the presence of the jury. The trial judge explained that Cooke would have the opportunity to address the jury later in the trial if he chose to testify, but for now he could tell the judge about any questions or concerns that he had. Cooke first explained that he was concerned that his attorneys would not ask witnesses the questions he wanted his attorneys to ask. The trial judge said that the attorneys normally decide which questions to ask the witnesses, but Cooke was free to give his attorneys his suggestions. Cooke's second concern was that the State was lying and his attorneys would not contradict the lies. The trial judge explained that he was not Cooke's lawyer and was simply trying to find out if there was some problem that was really bothering Cooke that the trial judge could address.

Cooke responded as follows:

Yeah, sure. I'm full of matters. I've got a lot of problems, I mean, with my counselors. They went beyond, you know, the reasons that—with this mental ill defense. I never agreed to none of that stuff and I've got the papers, you know, that prove I never agreed to that stuff and that's like going over my head, taking my rights from me, you know.

Rather than address the dispute between Cooke and his attorneys about the decision to pursue the guilty but mentally ill verdict, the trial judge said to Cooke, "I'm not

---

11. Defense counsel stated in the opening statement:

[W]hat the defense is going to do is to prove that Mr. Cooke is mentally ill. And at the end of this part of the case, the defense is going to ask you that you find Mr. Cooke mentally ill and really that's all we're going to ask you to do. We're not going to ask you to ignore substantial evidence presented by the State. We're simply going to ask you to look at all of the evidence that is presented to you during this trial. Now, before outlining the evidence that the defense will present to you, I want to explain to you that finding Mr. Cooke mentally ill does not mean that he's not guilty. If, based on the evidence presented, you find him guilty, then consider all of the evidence and if you find to your satisfaction that the evidence establishes that he's mentally ill, say so. That's what we're asking and that would result in a finding of guilty but mentally ill.

so sure I want to get into advice between you and your lawyers on that issue, Mr. Cooke. It's not really my function."

Cooke persisted, stating that he did not agree to the presentation of the mental illness evidence and that his attorneys knew that, but were presenting the evidence anyway.[12] Cooke also explained that he did not want the State to play portions of the tape recordings of the police interview with his girlfriend, Rochelle Campbell, without playing the entire recording. The trial judge told Cooke that the decision to play all or a portion of the recordings was a decision for Cooke's attorneys to make because "[t]hat is a tactical decision." Cooke responded:

> That's their tactic. That's not my strategy. If I'm telling you right now that I have talked to them about that and we disagree on that, they going to still override me and it's going to make it look like I'm pushing that issue that way. I'm not pushing that issue that way. They're using their own strategies. You know, their strategy, they want those pieces to be seen to make it look like I'm this mentally ill person, you know. That's wrong.

The trial judge addressed Cooke's other concerns, but never addressed Cooke's objection to his attorneys presenting evidence to support a guilty but mentally ill verdict. Trial then reconvened in Courtroom 8B, and the State began presenting evidence in its case-in-chief.

The trial continued without any mention of the dispute between Cooke and his attorneys about the guilty but mentally ill verdict and without any outbursts by Cooke, until February 5, during the prosecutor's direct examination of Amalia Cuadra about the burglary of her home. Cooke interrupted her testimony when he said: "Oh, man. I don't care. Excuse me, man." The jury was taken out of the courtroom. Cooke continued: "Oh, man. You setting me up in this whole place. They don't even know me. Only got four different reports here, man. Four different reports. Give me my stuff. Give me my stuff."[13] The trial judge excused Cooke and his counsel so that counsel could try to help Cooke calm down.

After meeting with Cooke, defense counsel reported to the trial judge that Cooke was very agitated and "expressed his opinion about what is happening here in the trial." Defense counsel explained that in Cooke's opinion, "it has not been a fair proceeding and he thinks he's being railroaded." Defense counsel had reminded Cooke that, if he wanted to remain in the courtroom, he would have to abide by court rules and could not talk until he testified. Defense counsel reported, however, that "I cannot guarantee that he will not have another outburst."

The trial judge decided to stop the proceedings for the day to give Cooke time to calm down overnight. The trial judge said that he would talk to Cooke in the morning, before Cuadra resumed her testimony, and would advise Cooke about the risks of having another outburst in court. The prosecutor appeared frustrated that Cooke had interrupted the trial testimony. He said: "It seems to me unfair to allow the defendant to cause a recess in the proceed-

---

**12.** Cooke also seemed to argue that it was contrary to the rules of professional conduct for lawyers to present such evidence over a defendant's objections. He said: "That's like putting me in the position where, you know, that's like they running over because they got the legal license to do it. It's like they could be [dis]barred for what they doing because, I mean, as a professional as they supposed to be under the law, the lawyer conduct, they aren't supposed to be doing that."

**13.** Cooke was apparently upset because Cuadra gave the police a few different descriptions of what the intruder looked like.

ings because of misconduct. He doesn't have a right to recess the proceedings." The trial judge said that Cooke "has a right to be present, which I have to respect."[14]

The next morning, February 6, before the jury was brought into the courtroom, the trial judge addressed Cooke and explained that it was not in Cooke's best interest to display the verbal conduct that he had displayed the day before, during Cuadra's testimony and in the presence of the jury. The trial judge explained that if another similar incident occurred, "I may have to decide at that point ... that you would have to be removed from the courtroom. Then the trial would continue without you present in the courtroom."

When the trial judge asked if Cooke understood him, Cooke asked if he could speak. The trial judge told Cooke that he could not. Cooke then accused the trial judge of threatening him during the February 2 colloquy and of violating his constitutional rights. Cooke also said: "I told you they wasn't representing me right. You still allowed that to go." Cooke seemed to be referring to the fact that his counsel mentioned the guilty but mentally ill verdict in their opening statement despite his objection.

Cooke also was angry about the possibility that certain tape recorded interviews would not be played in their entirety. The trial judge had Cooke removed from the courtroom and held that Cooke could not return until he informed his lawyers that he could be quiet in the presence of the jury. The court took a recess.

About twenty minutes later, defense counsel reported that Cooke was ready to return and would not misbehave in front of the jury. Defense counsel also explained that Cooke understood that he could be banished from the courtroom and forced to watch the trial by closed-circuit television from a holding cell if he had another outburst.[15] The trial judge requested that Cooke be brought back into the courtroom, and asked Cooke if he could behave in the presence of the jury. Rather than respond to the trial judge's question about whether he understood that he needed to remain quiet during the proceedings, the defendant answered: "I do understand that you're racial, biased." The trial judge asked again if the defendant could remain in the courtroom without having another "verbal statement such as you had yesterday afternoon" and the defendant did not respond. The trial judge decided to "give it a try." The trial judge had the jury brought back in and instructed the prosecution to call its witness.

Later that day, the prosecution concluded its direct examination of Cuadra. When the prosecution finished its direct examination, a short side-bar conference was held. After the side-bar, defense

---

14. The trial judge explained that he would talk to Cooke when Cooke was "in a more listening frame of mind than he is now." The trial judge also explained that he would have to give Cooke warnings about causing disruptions in court and the risk that he could be removed from the courtroom. He asked for the TV to be set up in Courtroom 6D in case Cooke needed to watch the proceedings from a holding cell via closed-circuit television, explaining that after the *Starling* trial, he asked JIC (the Judicial Information Center responsible for court technology) "to install a television set in the holding cell so that the defen-

dant could be in the holding cell, see the witness, and then counsel could go and speak to the defendant in the holding cell before he cross-examined the witness, even to find out they didn't want to cross-examine and things like that."

15. The trial judge said he was concerned that, if Cooke watched the proceedings from the holding cell, the jury and the people in the gallery would hear Cooke if he raised his voice, because the holding cell was just behind the courtroom. The trial judge was concerned about the publicity that might garner.

counsel stated that they had no questions for Cuadra on cross-examination. The trial judge excused the witness, and Cooke had another outburst, presumably because his attorneys did not to cross-examine Cuadra. Cooke said: "No, no, you can't keep railroading me; you railroading me like this. Come on, man, you keep railroading me like this; oh man, this is a racial case; oh man." The trial judge asked that the jury be removed as Cooke continued: "All these witnesses pass here. You got no questions for none of them. All of the statements these ladies made, oh man, oh. Ain't no shush, shush. These women said it was a dark male."

At that point, defense counsel said: "Your Honor, we ask that Cooke be removed" and Cooke was escorted out of the courtroom. The witness was excused and there was a short recess so defense counsel could talk to Cooke. After the recess, defense counsel explained that Cooke remained agitated but wanted to return to the courtroom. Cooke was brought back in, and the trial judge told Cooke that his right to be present in the courtroom was not absolute and could be surrendered if he was disruptive by commenting on a witness's testimony in the presence of the jury. The trial judge also explained that if Cooke had another outburst, the trial judge would move the trial to another courtroom and Cooke would have to watch the trial by television from a holding cell. The trial judge did not give Cooke an opportunity to speak.

Trial resumed on Monday, February 8, with the testimony of Georgia Carter, a handwriting analyst. The prosecution began with voir dire outside the presence of the jury. Cooke had another outburst. He was removed from the courtroom and the trial judge explained that Cooke's disruptions were not tolerable, even outside the presence of the jury. The trial judge stated that voir dire would continue without Cooke, and afterwards, he would check to see if Cooke was "willing to behave." The trial judge noted that Cooke had already had three outbursts in the presence of the jury, in addition to this one outside the jury's presence.

Defense counsel continued cross-examination and voir dire of Carter. When voir dire concluded, the trial judge excused the parties so that defense counsel could speak to Cooke and see if he was prepared to return to the courtroom. Defense counsel returned for a sidebar conference and reported that Cooke had calmed down and wanted to return. Defense counsel also reported that Cooke expected the Court to engage in a colloquy with him about his courtroom behavior.

Cooke was brought back into the courtroom and the trial judge began to explain to Cooke that he had a right to be present in the courtroom. Cooke replied: "You have a right to give me my fair trial?" The trial judge answered that Cooke's right to be present in the courtroom was not absolute and could be forfeited by disruptive behavior. The trial judge said his purpose was to give Cooke a fair trial. Cooke said: "Ain't no fair trial. You telling me fair trial?" The trial judge asked Cooke to decide whether he wanted to remain in the courtroom or be excused, and Cooke replied that the trial judge could do whatever he wanted to do because it was the trial judge's courtroom. The trial judge said: "Mr. Cooke, it is your right, sir. It is your choice." Cooke had another outburst at that point, his second outside the presence of the jury.[16]

16. The outburst went as follows:

 **The Defendant:** You're talking about my 6th Amendment Right; what about my 12th, my 14th, my 15th, my 19th, what about them Constitutional Rights? What about that? Don't I get an equal? I'm not equal? What about my 5th Amendment? I keep passing the documents to him [likely

Cooke was removed from the courtroom. When the jury was brought in, the trial judge instructed the jury that they were not to construe Cooke's absence from the courtroom as an indication of his guilt. The prosecution conducted its direct examination of Carter without Cooke present. Cooke did not watch the proceedings by closed-circuit television because Courtroom 8B was not configured with a camera for that purpose. The camera was in Courtroom 6D and the trial judge had not yet decided to move the proceedings to that courtroom.

Around 2 p.m., the parties reconvened and Cooke was brought back into the courtroom. Again, the trial judge asked Cooke if he could remain quiet and not be disruptive. Cooke brought up his dispute with his attorneys about seeking the guilty but mentally ill verdict. He said: "Why did you give me public defenders that's not representing me right? I talked to you about that on that Friday, February the 2nd. I didn't never pick this guilty but mentally ill. They said I was guilty." The trial judge said that Cooke's concern was "a matter of record already" and "not under discussion at this point." Cooke said: "But the more I tell you, the more you allow this stuff to go on." The trial judge said that there was nothing that he could say to Cooke at that point. The discussion continued as follows:

**The Defendant:** I mean, you can, you a Judge.

**The Court:** No, not at this point.

**The Defendant:** That means you just putting me on a railroad track and letting the train run over me.

**The Court:** Mr. Cooke, I would not sit here as a Judge and allow anyone to be railroaded.

**The Defendant:** That's what you doing. You are doing that, you capable to do something about that.

**The Court:** I can't stop you from having that opinion if you want but—

**The Defendant:** That's not opinion. That's the truth. I'm being railroaded. I'm speaking from the heart. You might be speaking from the mouth.

**The Court:** Well, Mr. Cooke, getting back to my question: Are you going to remain quiet if you stay here in the courtroom?

**The Defendant:** I already gave you my word. I said at the beginning.

The trial judge determined that Cooke would behave and had the jury brought back into the courtroom. The prosecution continued the presentation of its case-in-chief without any disruptions from Cooke for the rest of the day.

Trial resumed on Thursday, February 15, and Cooke returned to the courtroom. The trial judge asked Cooke if he could behave, meaning "no further verbal outbursts at any time or other kind of demonstrations such as hitting the desk or doing anything else like that." Cooke said he

indicating his trial counsel]. He's not representing me right, that's misrepresenting me. What about the video you not allowing them to see? What about that? What about the evidence that Detective Rubin is hiding? Huh? About the pipe he found? Huh? What about the boots at 208 Murray Road? He seized my boots on that, not no homicide. What about the hair that was found on Lindsey Bonistall's left hand that was Caucasian? What about the two DNA documents I got? Three DNAs found in

that young woman, European, Native American and African. What about that? Tell the people about that. Yeah.

**The Court:** Out, sir. You waived your presence in this courtroom. I cannot be assured that you will not be disruptive in the presence of the jury and harm your case. You've waived your right to be present.

**The Defendant:** What you talking about? I ain't waiving no rights.

would behave. Before the jury was brought into the courtroom, defense counsel told the trial judge that Cooke wanted to leave the courtroom when the medical examiner's photographs were introduced and the medical examiner testified. The trial judge addressed Cooke directly and asked whether he chose to leave the courtroom and return to the holding cell. Cooke said that he did want to leave and return to the holding cell. Cooke said he would return for the testimony of Detectives Rubin and Maiura but did not want to be present for the medical examiner's testimony. The trial judge excused Cooke.

Defense counsel had explained to Cooke that portions of the video tapes from the Newark Police interrogation and handwriting exemplar session were going to be played. The trial judge noted that one of Cooke's concerns about the trial was that he wanted the entire tapes from those two sessions played and not just portions selected by the State. The trial judge decided to speak to Cooke before the detectives' testimony to explain that only portions of the tapes would be played and to warn Cooke not to have an outburst.

Cooke was then brought back into the courtroom and the trial judge explained that only portions of the taped sessions would be played. Cooke said that he understood but thought it was unfair, because he was treated badly by the police and those portions of the tape would not be shown to the jury. Cooke felt that the prosecution was "tampering with evidence" because they were not showing the entire tape. The trial judge tried to explain that failure to show the entire tape did not constitute tampering with evidence. The trial judge also explained that he had watched the entire videotape of the session with the handwriting analyst for a pre-trial ruling regarding its admissibility, but had not watched the tape of the police interro-gation. The discussion continued as follows:

**The Defendant:** You can't cut pieces out like that. What they said about me and stuff like that. Remember they depicted, they called me the killer first. They called me the killer. They came at me like that.

**The Court:** Okay. Well, let me tell you, Mr. Cooke. The problem is that probably would be inadmissible anyway because the police view of whether you're guilty or not—

**The Defendant:** Let the jury decide that.

**The Court:** That's exactly the point.

**The Defendant:** [If you're] not playing the whole thing, they can't decide that. They will decide what them put on the table. They not laying the whole foundation.

**The Court:** Well, there's been an agreement about what should be shown or not shown, both from the point of view of the prosecution wanting to show what it needs to show and what your attorneys believe would be—

**The Defendant:** They're not working for me. I'm not guilty. They use that mentally ill. I didn't agree with that. You know that.

**The Court:** Mr. Cooke, I know that you don't agree with it, and that's why I'm—

**The Defendant:** Why are you allowing it to go on?

**The Court:** Because—

**The Defendant:** That's unconstitutional, though.

**The Court:** No, it's not, sir.

**The Defendant:** Yes, that is . . . . You can't give me somebody that is not representing me right. You forcing them on me.

**The Court:** That's not true.

**The Defendant:** That is true.

**The Court:** Anyway, I'm not going into the details of that at this point.

The trial judge asked Cooke whether he could remain in the courtroom without having an outburst while portions of the videotapes were played for the jury or whether he should be removed. Cooke indicated that he would stay and be quiet.

The jury was brought in and the State recalled Detective Maiura. The defense did not conduct cross-examination. Next, the prosecution called Detective Rubin. The defense did not conduct cross-examination of Detective Rubin either. The jury was taken out of the courtroom. Because the medical examiner was going to testify next, the trial judge gave Cooke the opportunity to leave the courtroom, since Cooke had indicated earlier that he did not want to be present for the medical examiner's testimony. Cooke said: "I'm staying"; and he was permitted to stay.

The jury was brought back into the courtroom and the prosecution conducted voir dire of the medical examiner. Defense counsel declined to conduct voir dire. The prosecution began its direct examination by asking the medical examiner about the autopsy of Lindsey Bonistall and about photographs of the victim's body. The trial judge interrupted the direct examination to give the jury an instruction, warning that some of the photos would be unpleasant and reminding the jurors that they had to decide the case without being influenced by emotion or sympathy. The trial judge concluded: "So, please keep those instructions in mind as you view the photographs, which will now be presented to you by the State." This precipitated another outburst by Cooke. He said: "Instruction? I'm not guilty. I'm not guilty. And they chose this mentally ill, and not me. You know, yeah, keep that in mind." The jury was taken out of the courtroom and Cooke was removed.

Defense counsel asked the trial judge to declare a mistrial because Cooke told the jury about his dispute with counsel about pursuing the guilty but mentally ill verdict. Defense counsel said:

The remarks that the defendant made were louder than he normally does and specifically addressed the statement ... basically to the effect that "this mental ill defense is not what I'm about," and "I'm not guilty," and phrases to that effect. That's highly prejudicial to the defense that we're putting on at this point. The outburst itself was disturbing, I would imagine, to the jury. The correctional officers did a fine job of moving him from the courtroom with as little disruption as possible; nevertheless, this is, to my count, the eighth or ninth time that they witnessed an outburst like this. And as such, we feel that the ability for him to have a fair trial in front of this jury has been so prejudiced that the Court needs to declare a mistrial.

The State responded that the dispute between Cooke and his counsel about presentation of the mental illness evidence "was caused by Cooke and by counsel, not by the State," and therefore the trial should proceed. The prosecutor noted that "[o]ne can easily envision if Cooke testifies we might hear similar kinds of outbursts, and the State had in the past, in the course of this proceeding cautioned that allowing this conflict to fester between counsel and defendant could cause problems." The trial judge noted that "the writ of mandamus has been denied." The State explained that it was concerned that Cooke was causing the problems and should not be able to benefit from his own misconduct.

The trial judge addressed the arguments and explained his position as follows:

I start from the premise that there's been no dispute about this defendant's competence to stand trial, that he's been found competent to stand trial. . . . That means he's competent to assist counsel or not assist counsel. He does not assist counsel by these outbursts. The issue of these outbursts, it's a little hard to say, because . . . while the Court has read some of the material submitted by the parties in connection with . . . partly the issue raised in the writ of mandamus, as well as the ongoing matter in this Court, as far as the claims by Mr. Cooke about his wishes versus . . . how defense counsel have approached this case. Again, there's nothing in what I have read in the reports from the two experts retained by the defense which would indicate . . . that Mr. Cooke is incapable of standing trial [or] incapable of making conscious decisions about things, including how he conducts himself in this courtroom or in court.

The trial judge noted that originally Cooke did not want to be present for the medical examiner's testimony, but later decided that he wanted to stay. Then, Cooke had an outburst when the medical examiner began to testify. The trial judge concluded that there was nothing in the psychiatric expert's reports to suggest that Cooke was incompetent to stand trial and therefore the trial judge found that Cooke's outbursts were voluntary. He explained: "I'm disturbed by the fact that he said he could remain in the courtroom for the medical examiner's testimony, would remain calm, and then chose to have this outburst in the presence of the jury, which I view as entirely within his power to do or not to do."

The trial judge stated that any prejudice caused by Cooke's conduct was "self-created" and denied the motion for a mistrial. The record reflects that the trial judge was focused more on the prejudicial effects of Cooke's outbursts than on Cooke's ob-jection to his attorneys presenting evidence to support a guilty but mentally ill verdict. The trial judge did not directly address the dispute or attempt to resolve it.

The prosecution requested that the trial judge rule, based on Cooke's repeated outbursts and misconduct, that Cooke waived his right to be present in the courtroom. The prosecution wanted Cooke excluded from the remainder of the proceedings, particularly because the defense's case-in-chief would focus entirely on Cooke's mental illness. The prosecutor explained that, "given that Cooke has repeatedly said on the record, and now in front of the jury, [that] he does not want that defense to be pursued, it is, I think, unreasonable to expect that he will control himself or behave himself."

Defense counsel asked to wait until the next morning to decide the issue so that Cooke had time to calm down, but suggested that they continue the rest of the day's proceedings without Cooke. The trial judge agreed that Cooke had waived his right to be present for the rest of the day, and the proceedings continued. Cooke watched by television from the holding cell.

After the medical examiner testified that the cause of death was strangulation, the prosecution concluded its direct examination and defense counsel engaged in a brief cross-examination. Defense counsel asked the medical examiner if she had an opinion as to whether Cooke was mentally ill at the time of the crime. The medical examiner said that she did not have an opinion and could not address that issue. That was the extent of defense counsel's cross-examination. The State rested its case-in-chief. The defense moved for a judgment of acquittal without additional comment. The trial judge ruled that the State had

established a prima facie case on all of the charges and denied the motion.

### 5. *The Defense's Case.*

The next morning, Friday, February 16, defense counsel informed the trial judge that Cooke wanted to be present for the presentation of the defense testimony. Defense counsel also requested that the trial judge engage in a colloquy with Cooke. The trial judge was concerned that Cooke would continue to have outbursts during the defense's case because Cooke did not agree with his attorneys' decision to pursue the guilty but mentally ill verdict and to present evidence accordingly. Defense counsel's response to the trial judge indicated that they agreed Cooke might have more outbursts during their presentation. The discussion went as follows:

> **The Court:** Let me ask you, particularly because of his different views of approach to this case, shall we say, since we are now getting into the defense case on an issue in terms of the approach which counsel are taking, with which he's disagreed, how is he going to respond to that?
>
> **Defense Attorney 1:** I think that's a fair observation, and that's all I'll say.
>
> **Defense Attorney 2:** I have to concur with [co-counsel]. That's all I have to say.

The trial judge explained that Cooke risked further prejudicing his case if he had more outbursts in front of the jury. The trial judge asked defense counsel if it would be helpful to have Cooke sit at counsel table during the presentation of the defense's case. Defense counsel responded that it would "probably not" be helpful to have Cooke present because "we have met with our witnesses. We have prepared our direct examination of the witnesses, ... but I can't say that his input will [be helpful]—unless he's changed his views of the type of defense that we're presenting."

The prosecutor renewed the State's motion for a ruling that Cooke was excluded from the remainder of the proceedings. The prosecutor explained:

> There's absolutely no reason to believe that he will be outburst-free during the remainder of the proceedings, past being prologue. In particular, we note that there has been a consistent theme or themes ... that have resulted in his outbursts, and one of those themes relates to ... the defense counsel's pursuit of a mental illness defense over the defendant's wishes. That's what we are about to spend the next week or so talking about.

The prosecutor requested in the alternative that the trial judge explain to Cooke that he will waive his right to be present in the courtroom, other than when he testifies, "if he has another outburst in front of the jury" or "mentions the mental illness defense and his disagreement with it in front of the jury."

In ruling on the State's motion, the trial judge noted that the defense's case would focus on the guilty but mentally ill verdict and that Cooke disagreed with that approach. The trial judge did not address the disagreement. He was more concerned about Cooke's outbursts and what Cooke said in front of the jury. The trial judge noted that there had been four outbursts in the presence of the jury at that point and four outbursts outside the jury's presence. However, he also noted that, the day before, Cooke had, for the first time, mentioned his disagreement with his attorneys in the presence of the jury and spoke in a louder voice than usual. The trial judge explained that the first three outbursts in front of the jury were "stage-whispered" but that the outburst the previous day was much louder.

The trial judge concluded that Cooke had a right to be present during the presentation of his case and decided to engage in another colloquy with Cooke. Cooke was brought into the courtroom for the colloquy. The trial judge asked if Cooke wanted to be present and Cooke said that he did. The trial judge also explained that Cooke's attorneys would be presenting witnesses on his behalf "in connection with the approach they believe is the approach to be taken in this case." The trial judge told Cooke that he recognized that it was an approach that Cooke disagreed with, as indicated by Cooke's comments.

Cooke again told the trial judge that he disagreed with his attorneys' approach. The trial judge did not address the disagreement, but instead said: "Now, that raises a question in my mind whether, when you're listening to this kind of evidence, evidence of a defense with which you disagree, you're going to be able to remain calm and not have any further outbursts in the presence of the jury." Cooke said that he could be calm, but explained: "All I'm saying, I never even, you know, discussed this with them about this. They took it on their own self. They took that by force. I mean, that's just run over me, period." He seemed to be saying that he did not want his attorneys to present evidence to support a guilty but mentally ill verdict and was upset because they were proceeding that way despite his objections.

The trial judge said again that Cooke's attorneys would "present witnesses in connection with the approach they have deemed appropriate," even if Cooke disagreed with that approach. The trial judge asked Cooke if he could remain calm in the courtroom even though he disagreed with the approach his attorneys were taking. Cooke said: "Yes, I can. But I brought this to your attention plenty of times." The trial judge said: "Yes, I know you

have." And Cooke responded: "I mean, it's like you're ignoring it." The judge explained that he understood Cooke's position but "we are getting into areas that I can't get into." The trial judge asked Cooke again if he could be quiet in the courtroom, "even though you disagree with the approach that your attorneys are taking regarding the evidence they're now going to present." Cooke said that he could be quiet. The trial judge warned Cooke that he would return to the holding cell if he had another outburst.

The defense called its first witness, Cooke's brother Rickie Patillo. Patillo testified about Cooke's difficult childhood, which included child abuse. Patillo testified that Cooke was treated differently than his siblings, was teased a lot as a child and did not have many friends. Patillo also testified that they had to steal food to eat, and that Cooke often got into trouble at school. During cross-examination, the prosecutor asked Patillo about Cooke's history as a drug dealer and his earlier conviction for drug dealing in New Jersey. Cooke's next outburst was precipitated by this discussion:

**The Prosecutor:** And that wasn't a surprise to you, because the whole time that you were growing up, you knew that the defendant was repeatedly doing things that either did get him arrested or at least could have got him arrested had he been caught, right?

**The Witness:** Right.

**The Prosecutor:** He was stealing things, right?

**The Witness:** Yes.

**The Prosecutor:** Sometimes he was assaulting people, right?

**The Defendant:** No.

**The Witness:** No. I don't remember that. I don't remember that.

**The Defendant:** They make me take a mentally-ill and—

The trial judge ordered that Cooke be removed. Cooke continued: "A mental ill defense? He setting me up in this. You taking my rights from me and everything." The jury was excused. Cooke was escorted from the courtroom.

Defense counsel again moved for a mistrial. The trial judge noted that "for the first time, the defendant substantially resisted being taken from the courtroom, and two correctional officers, two bailiffs, and Detective Rubin had to participate in restraining him." Cooke had to be physically restrained on the floor between the counsel tables. The struggle took place while the jury was being escorted out, but some jurors saw Cooke being restrained.

The trial judge also noted that it was the third or fourth time that Cooke said he could be calm and then had an outburst in front of the jury and that the outbursts were precipitated by Cooke's attorneys presenting evidence of his mental illness. The trial judge said: "I thought that I was very clear with him, and he said that he understood, that he was now going to hear testimony that would be consistent with the defense that [his attorneys] believe was in his best interests but one with which he disagreed. And he had to behave while he listened to that."

Again, the trial judge concluded that Cooke's conduct was intentional and that Cooke volitionally chose to have outbursts after assuring the judge that he would be quiet. The trial judge noted that Cooke engaged in his outburst when "the defense was seeking to portray a very difficult childhood through this first witness, as they indicated in their opening several weeks ago." The trial judge ruled that

Cooke would remain in the holding cell and watch the proceedings by television.[17]

Soon after, the trial judge was notified that Cooke was taken to the basement of the courthouse, rather than the holding cell behind the courtroom, and was in isolation so that he could be subdued. The trial judge asked that Cooke be brought back up to the holding cell once he calmed down so that Cooke could watch the proceedings from there.

In the meantime, trial continued. The jury was brought back into the courtroom. The witness was put back on the stand and the defense continued with its case, which focused on Cooke's mental illness. Patillo's testimony was followed by the testimony of three more witnesses.

Trial resumed on Tuesday, February 20. Before the proceedings began for the morning, the prosecution moved for an instruction that, if Cooke chose to testify, he could waive his right to testify by "contumacious conduct," such as continuing to speak after the trial judge has asked him to be silent or sustained an objection. The prosecutor was particularly concerned that Cooke would take the stand and talk about the dispute with his attorneys about their pursuit of the guilty but mentally ill verdict. The prosecutor said: "So we would ask that upon the first mention of the mental illness dispute by the defendant, his testimony will be terminated and he will be removed from the courtroom."

The prosecutor cited three cases in support of his argument and noted that Cooke had ten outbursts in the courtroom so far. The prosecutor said he believed that Cooke would testify that the State had fabricated evidence and other "less than flattering things about the prosecutors,"

---

**17.** The trial judge wanted to ensure that the record reflected that "this conduct is intentional, and therefore, he has, through his conduct, intentionally chosen to be persistently disruptive and demonstrated that he's incapable of remaining in this courtroom to watch the proceedings. It's regrettable, but that's his choice."

but said: "That's fine." The prosecutor objected, however, to Cooke "let[ting] the jury in on the dispute he's having with counsel" because it is "obviously irrelevant," "prejudicial," and "will create a mess that an appellate court might take years to sort through." The trial judge told defense counsel they could read the cases cited by the State before responding.

The trial judge called in the jury and the defense continued its case with the testimony of Dr. Alvin Turner, a psychologist who had evaluated Cooke. During Dr. Turner's testimony, without seeking a waiver of the psychoanalyst-patient privilege from Cooke, defense counsel asked whether Cooke had talked to Dr. Turner about the events surrounding Bonistall's death. Dr. Turner said that Cooke told him different things at different times, including that Cooke got angry at Bonistall after they had consensual sex, while they were laying in bed, and "he remembers standing up, with her sitting on the bed, and choking her. He said that he didn't understand why he did it." Dr. Turner also testified that Cooke said: "I couldn't believe it. I don't remember everything. I didn't know what I was doing. I couldn't believe she was dead"; but that on other occasions, Cooke would deny killing Bonistall and deny that he ever told Dr. Turner otherwise.

Defense counsel referred to a report by Dr. Turner and asked: "And did you write there, for example, 'At times he,' meaning Mr. Cooke, 'would describe realistic versions of having sex with the victim, choking her and killing her and then at other times he would deny having committed the crime at all?'" Dr. Turner said: "Yes."

On February 21, the trial judge began the proceedings by asking defense counsel whether Cooke wanted to return to the courtroom. Defense counsel had not asked Cooke if he wanted to return but Cooke had not affirmatively expressed any desire to return. Cooke did say that he watched the previous day's proceedings from the holding cell. The trial judge gave defense counsel permission to interrupt the proceedings at any time to speak to Cooke if they needed to. Trial continued with additional cross-examination of Dr. Turner. After re-direct, the defense called its next witness, Dr. Lawson Bernstein, a neuropsychiatrist who had examined Cooke. When the proceedings concluded for the day, defense counsel reported that Cooke had not yet decided whether or not to testify and that they would give the trial judge a report in the morning.

Before the trial judge excused the parties, the prosecutor asked for a ruling on the State's motion to admit evidence of the crimes Cooke allegedly committed in New Jersey, following the alleged crimes in Newark, Delaware. The prosecutor said: "I would ask your Honor to consider the shifting landscape as of today; to wit, Cooke's confession is now in evidence." The prosecutor argued that the prejudice that normally surrounds admitting evidence of uncharged misconduct—that the "jury will take what happened in another crime and assume guilt in the instant case"—is no longer an issue. The prosecutor said: "That issue is dead and gone now because Cooke has admitted at least that crime, that Bonistall burglary, rape and homicide. What's at issue in this case now, and really it's been an issue in the case first and foremost since [defense counsel's] wonderful opening statement, is Cooke's mental state."

The defense responded that Cooke's confession to the Bonistall homicide, admitted through the testimony of the defense expert witness, was "of no great consequence in this case" because the two home invasions committed prior to the Bonistall homicide "are really what are at

issue." The defense objected to the admission of Cooke's later New Jersey home invasions because the jury might use the testimony to infer that Cooke was guilty of the earlier burglaries and home invasions in Delaware. The defense explained: "And that's where you cross the line of [Rule] 403. We don't contest the fact that mental illness is a defense here; however, the State still bears the burden of proof beyond a reasonable doubt on Cuadra and Harmon [the victims of the two prior home invasions]."

Later that day, the trial judge held a conference, in a conference room behind the courtroom, to discuss with the parties the attendant logistics if Cooke chose to testify. During the conference, they discussed Cooke's disagreement with his attorneys about seeking a guilty but mentally ill verdict. The prosecution raised the issue when it asked the trial judge whether the trial judge would "directly admonish [Cooke] not to get into the, 'I don't want the mental illness defense' business." The trial judge noted that Cooke had twice said in front of the jury that he did not want a guilty but mentally ill verdict and so the jury obviously knew that he disagreed with that approach. The prosecution believed that, although the jury knew that Cooke did not want the mental illness evidence, the jury did not know that "the defendant is angry with his attorneys about it." The prosecution was concerned about having to "brief that issue for the rest of our lives about what happens when a defendant trashes his attorneys in his testimony in his trial."

Defense counsel also did not want Cooke to bring up his dispute with his attorneys. They had no objections, however, to Cooke testifying that he did not think he was mentally ill. Defense counsel also noted that Cooke had a right to say that he was not guilty. The trial judge and prosecution agreed. The prosecution clarified that

they were concerned that Cooke would refuse to answer questions on direct or cross-examination and would instead talk about his frustration with the trial judge's pre-trial rulings and his anger with his attorneys. The prosecution recognized that, "clearly, he can say he's not guilty" and that "he's not mentally ill." A discussion off the record followed and the conference concluded.

On February 22, the last day of the defense's case, Cooke was not present in the courtroom and told his attorneys that he did not want to attend the proceedings. The defense called a social worker who had worked with Cooke while he was in prison, followed by a pastor who had offered Cooke religious counseling while he was in prison. During direct examination of the pastor, defense counsel requested a sidebar conference and asked the trial judge whether or not it was permissible to ask the pastor if Cooke had confessed to killing Lindsey Bonistall. Defense counsel said: "I believe the answer [to that question] will be, 'Yes.' "

The trial judge excused the jury so the parties could discuss the issue more. The prosecution objected to the question because it called for hearsay. The defense argued that the pastor's testimony was relevant to bolster the testimony of Dr. Turner that Cooke had confessed to killing Bonistall. The trial judge was concerned that the pastor's testimony would violate the priest-penitent privilege and was not permissible without Cooke's express waiver.

Therefore, the trial judge asked the corrections officers to bring Cooke into the courtroom. The trial judge asked Cooke whether or not the pastor could testify about their conversations. Cooke responded that he did not want the pastor to testify. The trial judge concluded that Cooke had not waived the priest-penitent

privilege and that the pastor could not testify about Cooke's confession to the homicide.[18]

During the lunch recess, Cooke was brought back into the courtroom and the trial judge had a colloquy with Cooke to determine whether or not he wanted to testify. Cooke said that he had not yet decided. The trial judge explained that Cooke had to decide now. Cooke asked for ten more minutes to think about it and indicated that he wanted to talk to his attorneys about the decision.

When Cooke returned from meeting with his attorneys, he stated that he wanted to testify. Defense counsel stated that they had explained to Cooke that the trial judge would explain the limits of Cooke's right to testify and "the responsibilities that accompany his exercise of his right to testify." The trial judge told Cooke that he had to answer the questions he was asked, he had to be respectful and not argumentative, and that, although he could say that he is not guilty, he could not get into his dispute with his lawyers or any feelings he had about his lawyers and how they were handling his case. The trial judge told Cooke: "I'm not saying that you're not entitled to that opinion or whatever—you've expressed it several times in this courtroom and upstairs in 8B—but it's not a matter that is to come up during your testimony before the jury." The trial judge told Cooke that "[i]f you get into that area, I may have to interrupt you or there may be an objection from either one of your lawyers or the State about your testifying or making any comments along those lines." The trial judge also explained that Cooke could give up his right to testify and his testimony would be stricken if he became "too argumentative,

too disrespectful, [did] not give responsive answers" or had an outburst.

When the colloquy concluded and Cooke was escorted out of the courtroom, defense counsel requested a sidebar conference and asked for an *ex parte* conference with the trial judge regarding Cooke's testimony. Defense counsel stated:

> Your honor, we have a situation where, if the defendant is going to testify: A, it's going to be against his attorneys' advice, although he still has his right to testify; B, we have some trepidation about our tendering him as a witness, and for that reason we are going to request that we have an *ex parte* meeting about what we believe might happen, on the record.

Defense counsel explained that they preferred that the trial judge tender Cooke to testify. The trial judge granted defense counsel an *ex parte* conference in the trial judge's chambers before the jury returned from the luncheon recess.

At the *ex parte* conference in chambers, defense counsel explained:

> [T]he defendant is about to testify against his attorneys' advice and against his best interest. It could be a one-way ticket to the death house for him to testify and we really feel strongly that if he does choose to testify, he do it without the assistance of his attorneys. Our proposal would be, if he does proceed to testify, that the Court would have him at the stand when the jury is brought in and then briefly say to the jury that, "This is the time set ... aside for Mr. Cooke to be able to testify to the jury. Mr. Cooke, you may now testify," or words to that effect. We don't want to ask him any questions because we don't

---

18. The trial judge noted, however, that defense counsel had acted in good faith in calling the pastor because the defendant had previously waived the privilege and so the privilege had been waived "until a minute ago," when Cooke told the trial judge he did not want the pastor to testify.

think that it's in his best interest for us to ask him questions.

Defense counsel said they did not know what Cooke was going to say in his testimony, but "[they were] of the belief, beyond a reasonable doubt ... that he's guilty of these offenses and [they were] of the reasonable belief that he will probably testify to the contrary." Defense counsel further explained that they did not think Cooke was going to commit perjury because they reasonably believed that Cooke "believes he's not guilty."

Defense counsel explained that Cooke at first denied having committed the crimes, then confessed in January 2006, but, by the spring of 2007, "had reverted to, 'I didn't do it.' And he's been of that solid opinion since then." Defense counsel said that Cooke had been nice and congenial in his conversations with his attorneys, *"but in terms of where the two ships are sailing in this litigation, they're not on the same course."* Therefore, defense counsel did not want to present Cooke's testimony because they believed that Cooke would testify about what he believed was the truth—that he did not commit the crimes—but that this testimony would not be consistent with the truth—that he did commit the crimes.[19]

Defense counsel explained their main concern with calling Cooke to testify as follows: "[W]e're charged with representing him and we're trying to keep him from getting a death sentence. And in our view as his lawyers, participating in the direct examination with him would assist him not at all. It would hurt his chances to avoid a death sentence." Defense counsel consistently pursued a guilty but mentally ill verdict in an attempt to avoid a death sentence, but feared that if they called Cooke to testify—even if they simply introduced him and did not ask direct questions—"to the extent we have any credibility with this jury, we're going to undermine that."[20]

The trial judge recognized that defense counsel had already admitted Cooke's confession through the testimony of Dr. Turner, but also that from "what you're telling me, the indication is very strongly that he's going to say something to the opposite." Therefore, the trial judge determined that defense counsel did not need to call Cooke to testify. Instead, Cooke would be seated at the witness stand when the jury was brought into the courtroom[21] and the trial judge would ask the clerk to administer the oath to Cooke and then Cooke could testify as he chose. The trial judge also said that if Cooke testified successfully and obeyed the court's rules, he could return to the courtroom for the remainder of the trial.

### 6. *Cooke Testifies.*

Proceedings continued in the courtroom that afternoon. When the jury was brought in, Cooke was seated as planned, with his legs shackled but hidden from the jury's view. The trial judge said: "The next witness will be the defendant, Mr.

**19.** Defense counsel said: "[I]n my opinion right now at this moment in time, Mr. Cooke subjectively believes he did not kill Lindsey Bonistall. And that's his belief, notwithstanding the avalanche of evidence to the contrary.... [W]e cannot say, given our opinion of [Cooke's] subjective belief, that he did not kill Lindsey."

**20.** Defense counsel said they thought Cooke would commit "legal suicide" when he testified because they believed he would testify to the effect that it was "consensual sex, I left, I didn't kill her, that's somebody else's problem, the Newark Police are setting me up, it's a racial thing."

**21.** Cooke's legs were to be shackled, but he would be seated so that his shackles were concealed.

Cooke." The trial judge then administered the oath to Cooke and said: "All right. Mr. Cooke, you may proceed to testify, sir."

The very first thing Cooke told the jury was that he did not agree with his attorneys' decision to pursue a guilty but mentally ill verdict and that he was not guilty and was not mentally ill. He said: "First of all, I'd like to say I never picked this mentally ill defense. That was my public defenders' idea. Never chose it. Always argued about it." Cooke said he had consistently told his attorneys and the doctors that "I didn't do anything.... I didn't kill this person," but that his attorneys seemed not to care what he said.

The trial judge interrupted Cooke to remind him that he could not testify about that disagreement and told him to move on to another subject. Cooke proceeded to talk about his meetings with six different doctors who tried to "use psychology on me" but had already pre-judged him and formed the belief that he was guilty because his attorneys had told them so. "So that's why you heard what they said," explained Cooke, referring to the experts' testimony. Then he said: "So as the outbursts, as you heard me say, 'I'm not guilty. I never took this mentally ill defense.' You seen his presentation [referring to his counsel]. His presentation was 'Mr. Cooke is guilty but he's mentally ill.' ... So he had misrepresented me and I'm quite sure you seen that as well. He know I didn't do this."

Cooke also testified about his frustration with the trial judge. He stated that he told the trial judge about his dispute with his attorneys, but the trial judge did not listen because he also believed Cooke was guilty. Cooke said to the trial judge, "And now you expect me to hold my tongue back ... you expect me to abide by your rules. Like I'm supposed to fear you. The only person I fear is God. And if I die, like I said, I die for the truth. This woman wasn't who ... they say she was."

Cooke then said to the jury: "[T]hey use the mentally ill defense to railroad me. They want to make you believe that I'm crazy." He also stated, "I been got rid of these public defenders. I fired them a long time ago. The judge allowed me to keep them." Cooke said that he was being set up "because I had sex with the young woman." Later in his testimony, Cooke stated: "I'm not mentally ill. They know I'm not mentally ill. I'm quite sure the prosecutor know I'm not mentally ill. And the judge even know I'm not mentally ill.... They never wanted to fight the case, period. My own public defender told me when I first met him, he says, 'I'm not here to say you innocent, I'm only here to get the death penalty off you.' "

When Cooke began to talk about one of the jurors who Cooke believed had been involved in the crime, the prosecution objected and the trial judge asked the jury to be taken out of the courtroom. The trial judge reminded Cooke that he could not talk about the jurors and brought the jury back in. When Cooke started to talk about Bonistall, the prosecution objected again and the trial judge ordered the jury taken out again. The trial judge warned Cooke that he could not talk about Bonistall in front of the jury. Cooke seemed to argue that the jury had a right to know that he believed he had consensual sex with Bonistall. He said: "My public defenders even knew this and they never even spoke this up. Isn't that something? It's like I'm my own counselor."

The jury was brought back in and Cooke moved on to another, permissible topic for a while. When Cooke began to talk about a marijuana pipe that he believed was found in Bonistall's apartment and said that her roommate smoked marijuana, the trial judge ordered the jury out again.

When the jury was brought back in, Cooke said, among other things, "How can a man prove he's innocent if his public defender's not doing it? How? I mean, they actually want me to sit here and just take everything, you know." During his testimony, Cooke also told the jury that his legs were shackled under the table.

When Cooke concluded his testimony, he was cross-examined. When the prosecution concluded its cross-examination, the trial judge gave Cooke an opportunity for re-direct: "Mr. Cooke, if there's anything you wish to say in connection with the questions [the prosecutor] has asked you, now is your opportunity, sir." Cooke responded that he had nothing else to say "because I never done this, period." When Cooke and the jury were excused and left the courtroom, the trial judge ruled:

> It is my finding that based on the defendant's conduct this afternoon, he persists in conduct [that is] contumacious, disruptive, disrespectful and all other appropriate adjectives to a degree where he has waived his presence in this proceeding until some possible future point, which might be closing or the return of a verdict. I'm going to ask defense counsel to check with him each day to [affirmatively ask him] whether he wishes to return. And if he expresses that he wishes to do so, advise me and we'll evaluate that.

### 7. *The State's Rebuttal.*

On Monday, February 26, 2007 the State began its rebuttal. Cooke was not present. He watched the proceedings from the holding cell. After the State presented the testimony of Dr. Mechanick, there was a recess so that defense counsel could ask Cooke if he had any questions for the doctor on cross-examination. Cooke indicated that he did not.

The next day, Cooke was still absent from the courtroom. Defense counsel told the trial judge that they had met with Cooke that morning to find out if he wanted to return to the courtroom and Cooke said that he did not. After the luncheon recess, before the jury returned to the courtroom, the trial judge discussed with the attorneys whether "guilty but mentally ill" was a defense, a mitigator (*i.e.*, something less than a conviction) or a conviction. A statement by the prosecutor led to a discussion that indicated that the trial judge and the attorneys knew that defense counsel's decision to pursue the guilty but mentally ill verdict, despite Cooke's objection, could have ramifications on appeal, but they did not know how to address the issue. The discussion went as follows:

> **The Prosecutor:** Well, it is a conviction, but it's not the same thing [as a finding of "guilty."] And if it is the same thing, then these guys [defense counsel] are professionally negligent in asking for it. I mean, let's not ignore the elephant in the room. Presumably, [defense counsel], as well-schooled and as technically proficient as they are, wouldn't be asking for a "guilty but mentally ill" verdict unless it was somehow advantageous. And that's all the Court is saying. Of course it's a conviction. So is extreme emotion distress.
>
> **The Court:** Let's not go down this avenue, please. Let's leave it there.

In the afternoon, the defense conducted cross-examination of Dr. Mechanick. Defense counsel asked the doctor about the dispute Cooke was having with his attorneys about the guilty but mentally ill verdict, presumably to support the defense's argument that Cooke was mentally ill. The doctor had testified that Cooke may have been malingering when he displayed symptoms of mental illness in prison. Defense counsel asked the doctor:

[T]he evidence you have to consider that's before you, is that Mr. Cooke told Dr. Turner that he's not mentally ill and that he's not pursuing a mental illness defense; he told Dr. Bernstein that he's not mentally ill and that he's not pursuing a mental illness defense; he told you that he's not mentally ill and that he's not pursuing a mental illness defense; and he told this jury that he's not mentally ill and he's not pursuing a mental illness defense? Isn't that evidence that you have to go on right now?

In a follow-up question, defense counsel asked: "But you can say this: That what he said to you, what he said to Dr. Turner, what he said to Dr. Bernstein and what he said to this jury has been consistently, 'I'm not mentally ill and I'm not about a mental illness defense,' isn't that true?"

On Wednesday, February 28, Cooke wanted to return to the courtroom. Part of the prosecution's rebuttal evidence the previous day had included testimony and police reports about the New Jersey home invasions. Cooke wanted to address that evidence. Cooke was brought into the courtroom and the trial judge asked him if he wanted to return to the courtroom for the proceedings. Cooke answered that he wanted to be present and he wanted some of his questions answered by the witnesses from the previous day and he wanted to testify about those witnesses' testimony. The trial judge explained that Cooke's attorneys decide what questions to ask the witnesses. Cooke was frustrated that his attorneys were not asking the questions he wanted them to ask.

Cooke also seemed frustrated that he had spoken to the trial judge about his disagreement with his attorneys and the trial judge had not addressed his concerns. Cooke began to indicate that he believed he was representing himself. He wanted to testify again and address the rebuttal testimony, particularly Detective Rubin's

testimony. He said: "I should be allowed to testify again on these matters. . . . I should be able to defend myself by doing that because they [defense counsel] are not defending me, period." Cooke also stated that if he could not testify and his attorneys would not ask the questions he wanted them to ask, he would choose not to be present because he could not guarantee that he would not have an outburst. Cooke said: "I would rather just be out while this is happening."

The trial judge honored Cooke's wishes and told him that he could continue to watch the proceedings from the holding cell while the state's rebuttal continued. The trial judge reserved his decision as to whether Cooke could take the stand again to address the rebuttal evidence. Cooke was escorted out of the courtroom. The State continued its rebuttal.

### 8. *Cooke Testifies Again.*

When the State concluded its rebuttal, the jury was excused and the trial judge brought in Cooke for another colloquy. Cooke said that he wanted to take the stand again to discuss the New Jersey home invasions and Dr. Mechanick's testimony, particularly what Cooke did and did not say to the doctor. The trial judge explained that Cooke could only talk about things that were brought up in the State's rebuttal and that if Cooke went beyond that and started talking about, among other things, "complaints about your lawyers or complaints about how your lawyers are handling this case versus how you wanted to handle the case," Cooke would have to leave the courtroom. The trial judge also reminded Cooke that if he testified again, his legs would be shackled, but the shackles would be concealed from the jurors. The trial judge explained that it was not in Cooke's best interest to tell the jurors he

was shackled, like he did the last time he testified.

The trial judge asked if defense counsel wanted to speak and defense counsel stated:

It is the advice that we have given Mr. Cooke that—understanding our differences in the trial strategies that we have pursued and that he wished us to pursue and recognizing those differences in opinion—it remains our advice to him that he is not best served by testifying. In other words, it is against the advice of his lawyers that he testify at this point.

The State continued to object to allowing Cooke another opportunity to testify, but the trial judge disagreed with the prosecutor's arguments. The trial judge concluded that he would permit Cooke to testify again. The trial judge also warned the prosecutor not to provoke Cooke during cross-examination. The trial judge said: "Honestly, I seriously had problems with your behavior last Thursday [when the defendant testified] and I'm telling you this now—I wish I had interceded further because I think some of it exacerbated a situation which you knew was going to be difficult as it is. I just don't want a repeat."

When the jury was brought back into the courtroom, Cooke was again seated at a special witness stand where his legs could be shackled but not visible to the jury. The trial judge said to Cooke: "You have indicated that you wish to address certain matters which came up in connection with the State's rebuttal evidence. You may now do so, sir."

Cooke began with the following: "First of all, I would like to talk about the incident from Atlantic City, one thing. Like I told you on Thursday, I'm defending my own self. So I don't have to speak on that no more." Then Cooke talked about the New Jersey crimes and gave details about

the crimes that were not in evidence. When the trial judge told Cooke he could only talk about things that were brought up in the State's rebuttal, Cooke said: "I need to let the jury know the truth.... I mean, you're trying to convince the jury like I'm a compulsive liar. But it seems to me the State is a hypocrite and not me because everything I said was true." The trial judge excused the jury and explained to Cooke that he was not following the rules and he was testifying about things that were not in evidence, and therefore, he lost his right to continue testifying. The trial judge said: "I'm going to stop this right now before it gets any worse." Cooke was removed from the courtroom.

After the jury was excused for the day, the trial judge ruled that, because of Cooke's conduct, he would not be permitted to return to the courtroom, "even during summation and charge." The trial judge was "concerned with any disruptions that may interrupt the flow of counsel or me in the arguments and charging the jury" and also noted that Cooke "still alludes to the dispute he has with his own counsel about the case." The trial judge was afraid that during the defense summation Cooke would interrupt in a way that would be more prejudicial to him than his absence from the proceedings would be. Therefore, Cooke would continue to watch the proceedings by television from the holding cell.

### 9. *Prayer Conference.*

The proceedings resumed with the prayer conference in the trial judge's chambers on March 2, 2007. The trial judge warned the defense counsel that defense counsel's statement in his opening, that there was no difference between "guilty but mentally ill" and "guilty" as far as the potential punishment, was not proper. The trial judge told defense counsel not to argue in summation that a verdict of guilty but

mentally ill would not diminish the potential punishment Cooke would receive.[22] Defense counsel said that he would comply with the trial judge's order but would come as close to suggesting that as he possibly could.

### 10. Closing Arguments.

The parties gave their closing arguments on March 5, 2007. During the defense's closing, defense counsel told the jury that, although Cooke said he disagreed with his attorneys' approach and claimed he was not mentally ill, the jury should take that as evidence of his mental illness. Defense counsel said: "Mr. Cooke's testimony that he's not pursuing a claim of mental illness and that it's his lawyers that are doing it, that's true." Defense counsel explained that, even though "Mr. Cooke disagrees with his lawyers," it "does not diminish his claim of mental illness. It really reinforces it." Defense counsel continued:

> Mr. Cooke cannot or will not admit his mental illness, that's part of his pathology. And, in the context of this case, mental illness is not a defense, it's not an excuse, it's merely Mr. Cooke's mental status when he committed these crimes. And he committed these crimes, and you should find him guilty, guilty but mentally ill. We have all heard Mr. Cooke's statement, "I'm not guilty. I'm not mentally ill." With all due respect to Mr. Cooke, the evidence proves that he's wrong on both counts. But you are the judges of that, you'll consider all of the evidence and reach your verdict. I'm confident that you will find Mr. Cooke guilty but mentally ill on all the counts.[23]

In the State's closing, the prosecutor also remarked on Cooke's disagreement with his counsel. The prosecutor criticized the defense's argument that the jury should consider the fact that the defendant does not want to pursue a mental illness verdict as evidence of his mental illness. The prosecutor argued that whether Cooke wanted to pursue a mental illness verdict was irrelevant to whether or not he had a mental illness. The prosecutor urged the jury to find that Cooke did not have a mental illness and to simply find him guilty.

### 11. The Jury's Verdict and the Penalty Phase.

The trial judge stated that Cooke had a right to be present for the reading of the verdict, but the trial judge would have a colloquy with Cooke beforehand to remind Cooke to behave. During the colloquy, the trial judge told Cooke that he did not have a right to speak during the return of the verdict but if there was a verdict of guilty, Cooke could address the jury in the penalty phase. Cooke said that he would be quiet during the return of the verdict. The jury returned a verdict of guilty on all counts. Cooke remained quiet throughout the proceedings.

Despite failing to obtain a guilty but mentally ill verdict, during the penalty phase, counsel emphasized Cooke's mental state as a mitigating circumstance, along with his traumatic childhood, his learning disabilities, and the impact his execution would have on his family. The jury voted unanimously to recommend a sentence of death. In a June 6, 2007 opinion, the trial judge agreed with the jury's recommenda-

---

22. While they were discussing an unrelated issue, the prosecution noted that there were "zero cases to tell you who gets to choose the mental illness defense, defense counsel or client."

23. Defense counsel later summarized his closing argument as follows: "I stood in front of this jury and said, 'He's guilty,' and 'Just determine whether he's mentally ill or not.'"

tion and sentenced Cooke to death.[24] Trial counsel filed a timely notice of appeal and moved to withdraw and/or for the appointment of independent counsel. We granted the motion and appointed the present appellate counsel.

### III. Cooke's Sixth Amendment Claim

■ Cooke contends that the Superior Court deprived him of his Sixth Amendment rights guaranteed by the United States Constitution when it: (1) permitted his defense attorneys to present evidence and argue to the jury that he was "guilty but mentally ill" over his express and repeated objections; and (2) failed to sufficiently and timely inquire into his dispute with his defense attorneys about their decision to pursue a verdict of "guilty but mentally ill."[25] We review claims of violations of constitutional rights de novo.[26]

■ The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to ... have the Assistance of Counsel for his defence."[27] The United States Supreme Court has long held that "the right to counsel is the right to the effective assistance of counsel."[28] The purpose of this right is to "ensure a fair trial" and "ensure that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding."[29] Accordingly, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."[30]

### A. Defense counsel's decision to pursue a verdict of guilty but mentally ill violated Cooke's constitutional rights.

■ When a defendant is represented by counsel, the authority to manage the day-to-day conduct of the defense rests with the attorney.[31] Specifically, the defense attorney "has the immediate and

**24.** State v. Cooke, 2007 WL 2129018 (Del.Super.Ct. June 6, 2007).

**25.** Because the Sixth Amendment requires reversal in this case, we do not address Cooke's claim under Article I, Section 7 of the Delaware Constitution.

**26.** Norman v. State, 976 A.2d 843, 856–58, 2009 WL 1676828, at † 8 (Del.2009); Weber v. State, 971 A.2d 135, 141 (Del.2009); Capano v. State, 781 A.2d 556, 607 (Del.2001).

**27.** U.S. Const. amend. VI; see Johnson v. Zerbst, 304 U.S. 458, 463, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938) (holding that the Sixth Amendment right to counsel in criminal proceedings applies in federal courts); Gideon v. Wainwright, 372 U.S. 335, 342, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (holding that the Sixth Amendment right to counsel in criminal proceedings applies to states through the Fourteenth Amendment); see Kimmelman v. Morrison, 477 U.S. 365, 380, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986) (explaining that the constitutional right to counsel is not "conditioned upon actual innocence," but rather is "granted to the innocent and the guilty alike").

**28.** McMann v. Richardson, 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970); see, e.g., Reece v. Georgia, 350 U.S. 85, 90, 76 S.Ct. 167, 100 L.Ed. 77 (1955); Glasser v. United States, 315 U.S. 60, 69–70, 62 S.Ct. 457, 86 L.Ed. 680 (1942); Avery v. Alabama, 308 U.S. 444, 445, 60 S.Ct. 321, 84 L.Ed. 377 (1940); Powell v. Alabama, 287 U.S. 45, 57, 53 S.Ct. 55, 77 L.Ed. 158 (1932).

**29.** Strickland v. Washington, 466 U.S. 668, 686, 691–92, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); see also United States v. Cronic, 466 U.S. 648, 658, 104 S.Ct. 2039, 80 L.Ed.2d 657(1984).

**30.** Strickland, at 686, 104 S.Ct. 2052

**31.** New York v. Hill, 528 U.S. 110, 114–15, 120 S.Ct. 659, 145 L.Ed.2d 560 (2000); Taylor v. Illinois, 484 U.S. 400, 418, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988); Wainwright v. Sykes, 433 U.S. 72, 93, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977) (Burger, C.J., concurring); accord In re Petition of State for a Writ of Mandamus, 918 A.2d 1151, 1154 (Del. 2007).

ultimate responsibility of deciding if and when to object, which witnesses, if any, to call, and what defenses to develop."[32] In addition to shouldering these tactical decisions, representation of a criminal defendant entails certain basic duties.

Counsel's function is to assist the defendant, and hence counsel owes the client a duty of loyalty, a duty to avoid conflicts of interest. From counsel's function as assistant to the defendant derive the overarching duty to advocate the defendant's cause and more particular duties to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution. Counsel also has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process.[33]

The defense attorney's duty to consult with the defendant regarding "important decisions" does not require counsel to obtain the defendant's consent to "every tactical decision."[34] However, certain decisions regarding the exercise or waiver of basic trial and appellate rights are so personal to the defendant "that they cannot be made for the defendant by a surrogate."[35] In *Jones v. Barnes*,[36] the United States Supreme Court recognized that a criminal defendant has "ultimate authority to make certain fundamental decisions regarding the case, as to whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal." Such choices "implicate inherently personal rights which would call into question the fundamental fairness of the trial if made by anyone other than the defendant."[37]

**32.** *Wainwright*, 433 U.S. at 93, 97 S.Ct. 2497; *accord In re Petition of State*, 918 A.2d at 1155; *see also Strickland*, at 690, 104 S.Ct. 2052 (explaining that "strategic choices made after thorough investigation of the law and facts relevant to plausible options are virtually unchallengeable").

**33.** *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052 (citing *Cuyler v. Sullivan*, 446 U.S. 335, 346, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980); *Powell*, 287 U.S. at 68–69, 53 S.Ct. 55); *see also Faretta v. California*, 422 U.S. 806, 820, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) (explaining that "however expert, [a defense lawyer] is still an assistant" and not a "master" because otherwise "the right to make a defense [would be] stripped of the personal character upon which the [Constitution] insists."); *cf.* Del. Lawyers' Rules of Prof'l Conduct R. 1.4(a)(1) ("A lawyer shall ... reasonably consult with the client about the means by which the client's objectives are to be accomplished"); Restatement (Third) of the Law Governing Lawyers § 16, cmt. c (2000).

**34.** *Florida v. Nixon*, 543 U.S. 175, 187, 125 S.Ct. 551, 160 L.Ed.2d 565 (2004) (citing *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052; *Taylor*, 484 U.S. at 417–18, 108 S.Ct. 646).

**35.** *Nixon*, 543 U.S. at 187, 125 S.Ct. 551; *see also Faretta*, 422 U.S. at 819–20, 95 S.Ct.

2525 (explaining that the Sixth Amendment provides an "implied" right "to defend [that] is given directly to the accused; for it is he who suffers the consequences if the defense fails.").

**36.** 463 U.S. 745, 751, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983); *see also Nixon*, 543 U.S. at 187, 125 S.Ct. 551; *Wainwright*, 433 U.S. at 93 n. 1, 97 S.Ct. 2497; *accord In re Petition of State*, 918 A.2d at 1154. In *Jones*, the Court recognized that this principle was embodied in the then-proposed Model Rules of Professional Conduct Rule 1.2(a) (Final Draft 1982), which provides: "A lawyer shall abide by a client's decisions concerning the objectives of representation ... and shall consult with the client as to the means by which they are to be pursued.... In a criminal case, the lawyer shall abide by the client's decision ... *as to the plea to be entered, whether to waive jury trial and whether the client will testify.*" 463 U.S. at 753 n. 6, 103 S.Ct. 3308; *cf.* Restatement (Third) of the Law Governing Lawyers § 22(1).

**37.** *Arko v. People*, 183 P.3d 555, 558 (Colo. 2008); *see also Gonzalez v. United States*, —— U.S. ——, 128 S.Ct. 1765, 1771, 170 L.Ed.2d 616 (2008) ("[S]ome basic trial choices are so important that an attorney must seek the

Therefore, as to these decisions on the objectives of the representation, a lawyer "must both consult with the defendant *and* obtain consent to the recommended course of action." [38] These rights cannot be waived by counsel without the defendant's fully-informed and publicly-acknowledged consent.[39]

 Accordingly, the defendant has autonomy to make the most basic decisions affecting his case, including whether to plead not guilty and have a trial by jury where he has an opportunity to confront and cross-examine adverse witnesses, and whether to testify.[40] Although these fundamental decisions are indeed strategic choices that counsel might be better able to make, because the consequences of them are the defendant's alone, they are too important to be made by anyone else.[41] Moreover, counsel cannot undermine the defendant's right to make these personal and fundamental decisions by ignoring the defendant's choice and arguing affirma-

tively against the defendant's chosen objective.[42] Here, defense counsel pursued a "guilty but mentally ill" verdict over Cooke's vociferous and repeated protestations that he was completely innocent and not mentally ill. This strategy deprived Cooke of his constitutional right to make the fundamental decisions regarding his case.

### 1. Defense counsel infringed Cooke's right to plead not guilty.

 One of the fundamental decisions reserved for the defendant alone to make is the plea decision.[43] In Delaware, "[a] defendant may plead not guilty, guilty, nolo contendere, or guilty but mentally ill." [44] A defendant may also raise the "defense" of "guilty but mentally ill" at trial.[45] In this case, Cooke was competent to stand trial and chose the alternative of a plea of not guilty over a plea of guilty but mentally ill.[46] Nevertheless, Cooke's attorneys decided to override Cooke's choice and advised the trial judge that they would

---

client's consent in order to waive the right.") (citing *Nixon*, 543 U.S. at 187, 125 S.Ct. 551).

**38.** *Nixon*, 543 U.S. at 187, 125 S.Ct. 551 (emphasis added).

**39.** *See Taylor*, 484 U.S. at 417–18, 108 S.Ct. 646; *Brookhart v. Janis*, 384 U.S. 1, 7–8, 86 S.Ct. 1245, 16 L.Ed.2d 314 (1966).

**40.** *See Boykin v. Alabama*, 395 U.S. 238, 243, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969) (right to plead not guilty); *Duncan v. Louisiana*, 391 U.S. 145, 149, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968) (right to trial by jury); *Pointer v. Texas*, 380 U.S. 400, 403, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965) (right to confront witnesses); *Malloy v. Hogan*, 378 U.S. 1, 6, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964) (right to not testify).

**41.** *See Faretta*, 422 U.S. at 819–20, 95 S.Ct. 2525; *Brookhart*, 384 U.S. at 7–8, 86 S.Ct. 1245.

**42.** This rule is consistent with, although not controlled by, Rule 1.2(a) of the Model Rules of Professional Conduct, Rule 1.2(a) of the

Delaware Lawyer's Rules of Professional Conduct, and the Restatement (Third) of the Law Governing Lawyers § 22(1) cmt. b, d.

**43.** *Gonzalez*, 128 S.Ct. at 1769 (explaining right to plead not guilty is a fundamental right that defendant must waive personally and attorney alone cannot waive).

**44.** Super Ct Crim. R. 11(a).

**45.** *See* 11 *Del. C.* § 408.

**46.** In *Indiana v. Edwards*, —— U.S. ——, 128 S.Ct. 2379, 2387–88, 171 L.Ed.2d 345 (2008), the United States Supreme Court recognized that defendants could be competent to stand trial, but not sufficiently competent to represent themselves. The Court held that the Sixth Amendment right to self-representation did not prohibit States from insisting on counsel when defendants were not competent to conduct trial proceedings themselves. Here, there is no indication that Cooke was not sufficiently competent to make decisions about his case.

ask the jury, over Cooke's objection, to find Cooke guilty but mentally ill.

In a pretrial conference, the defense attorneys told the trial judge that the conflict between their objective and Cooke's objective might result in disastrous consequences before the jury. The judge was concerned about the propriety of the defense attorneys pursuing an objective that was inconsistent with Cooke's objective. The trial judge stated: "I don't know how you can argue something that has the word 'guilty' in it when the defendant doesn't want you to, because it's guilty as charged, not guilty of the lesser-included offense." Yet, the record reflects that defense counsel did so without the trial judge ever attempting to address the rift counsel described as an impending disaster.

In their opening statement, Cooke's defense attorneys gave no support for Cooke's desire to plead not guilty. Instead, they told the jury they would introduce evidence that Cooke was "guilty but mentally ill." Later, in presenting that mental illness evidence during trial, Cooke's defense attorneys introduced a confession which he disputed. Then, in their closing argument to the jury, Cooke's defense attorneys asked the jury to reject Cooke's plea of not guilty because "he committed" the crimes with which he was charged. They did not ask the jury to consider Cooke's objective of being found not guilty, but instead asked the jury to agree with their objective by finding Cooke guilty but mentally ill.

The defense attorneys told the trial judge that they saw no problem with Cooke entering a not guilty plea and asserting his innocence while they argued to the jury that he was guilty but mentally ill. We find two problems with that course of conduct. First, Cooke did not have the "assistance" of counsel in pursuing his chosen objective for the trial—obtaining a not guilty verdict.[47] Second, Cooke was denied the benefit of the reasonable doubt standard and meaningful adversarial testing of the prosecution's case.[48] Consequently, Cooke's fundamental right to enter a plea of not guilty was effectively negated by the conflicting objective of his defense attorneys to have the jury find him guilty but mentally ill.[49]

2. *Defense counsel negated Cooke's right to testify in his own defense.*

■■ A second fundamental decision reserved for the defendant alone to make is the decision to testify.[50] Cooke wanted to exercise his right to testify in his own defense, but his attorneys refused to call him as a witness because they believed that he would assert his innocence, contradicting counsel's position that Cooke was guilty of the crimes charged. They ex-

---

**47.** *Cronic,* 466 U.S. at 656, 104 S.Ct. 2039 ("[T]he adversarial process protected by the Sixth Amendment requires that the accused have counsel acting in the role of an advocate.") (citations omitted).

**48.** *Id.* ("The right to the effective assistance of counsel is thus the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing."); *see also Weber,* 971 A.2d at 142–43 (stating that the trial judge has an obligation to ensure "that the jury will accord the defendant the full benefit of the reasonable doubt standard").

**49.** *Nixon,* 543 U.S. at 187, 125 S.Ct. 551 (citing *Jones,* 463 U.S. at 751, 103 S.Ct. 3308; *Brookhart,* 384 U.S. at 6–7, 86 S.Ct. 1245); *see Gonzalez,* 128 S.Ct. at 1769 (citing *Brookhart,* 384 U.S. at 7–8, 86 S.Ct. 1245).

**50.** *Riggins v. Nevada,* 504 U.S. 127, 144, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992) ("It is well established that the defendant has the right to testify in his own behalf, a right we have found essential to our adversary system.") (citing *In re Oliver,* 333 U.S. 257, 273, 68 S.Ct. 499, 92 L.Ed. 682 (1948)).

plained that Cooke's assertion of factual innocence would not be perjury because Cooke believed he was innocent.[51] The defense attorneys then told the trial judge, who would make the final decision on whether to sentence Cooke to life or death, that they believed Cooke had committed the crimes and was guilty but mentally ill. Ultimately, the trial judge called Cooke to testify because his defense attorneys refused to do so.

Cooke testified that he did not agree with his attorneys' guilty but mentally ill strategy and that he was "on his own" for representation. Cooke denied committing the crimes in an effort to realize his trial objective of being found not guilty. In an effort to realize their independent trial objective of having the jury return a verdict of guilty but mentally ill, Cooke's defense attorneys completely negated Cooke's objective of having the jury find him not guilty by introducing into evidence—without seeking Cooke's waiver of the psychotherapist-patient privilege[52]—a confession which Cooke denied making. Cooke's attorneys also attempted to ask

Cooke's pastor, on direct examination, whether Cooke had confessed, but Cooke refused to waive his right to protect the privileged communication.[53] That exchange on the record illustrates the magnitude of the conflict between Cooke and his attorneys.

The prosecution recognized that the question of Cooke's innocence was no longer an issue after the defense attorneys introduced Cooke's disputed statements to Dr. Turner. The prosecutor said: "I would ask your Honor to consider the shifting landscape as of today; to wit, Cooke's confession is now in evidence." In response to an argument about prejudice from the introduction of "other crimes," the prosecutor said: "That issue is dead and gone now because Cooke has admitted at least that crime, that Bonistall burglary, rape and homicide. What's at issue in this case now, and really it's been an issue in the case first and foremost since [defense counsel's] wonderful opening statement, is Cooke's mental state." Consequently, Cooke's fundamental right to testify in his own defense was effectively negated by the objective of his defense attorneys to have the jury find him guilty but mentally ill.[54]

---

**51.** Counsel apparently recognized that to be guilty of perjury, a person must "swear falsely." *See* 11 *Del. C.* § 1223. "A person 'swears falsely' when the person intentionally makes a false statement or affirms the truth of a false statement previously made, knowing it to be false or not believing it to be true, while giving testimony or under oath in a written statement." 11 *Del. C.* § 1224; *see also Nix v. Whiteside*, 475 U.S. 157, 171, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986) (holding that the right to the effective assistance of counsel is not violated when an attorney refuses to assist the defendant in presenting perjured testimony).

**52.** *See* DEL. R. EVID. 503 (mental health provider, physician, and psychotherapist-patient privilege) (providing for a privilege that allows the patient to refuse to disclose confidential communications made to a mental health provider for the purpose of diagnosis or treatment unless, among other exceptions, the communication is relevant to an issue of the

mental or emotional condition of the patient used as an element of a claim or defense in any proceeding).

**53.** *See* DEL R. EVID. 505 (religious privilege) (providing for a privilege that allows a person to refuse to disclose, and to prevent another from disclosing, a confidential communication by the person to a clergyman in his capacity as a spiritual advisor). For undisclosed reasons, defense counsel believed that Cooke had confessed to his pastor that he killed Lindsey Bonistall; however, the record does not indicate whether or not Cooke acknowledged any such confession.

**54.** *Nixon*, 543 U.S. at 187, 125 S.Ct. 551 (citing *Jones*, 463 U.S. at 751, 103 S.Ct. 3308); *see Riggins*, 504 U.S. at 145, 112 S.Ct. 1810 (explaining that preventing a defendant from exercising his constitutional right to take the stand in his own defense "would contradict not only the right of the accused to con-

### 3. *Defense counsel deprived Cooke of the right to an impartial jury trial.*

■ A third fundamental decision reserved for the defendant alone to make is the decision to have a jury trial.[55] Cooke's defense attorneys compromised the impartiality of his jury, starting with their opening statement, in which they told the jury—against Cooke's wishes—that Cooke was guilty but mentally ill. The record reflects frequent exchanges between the trial judge, the defense attorneys, and the State about the fear that Cooke would react adversely in front of the jury about the conflict between him and his attorneys over the objective of Cooke's trial.

Although the trial judge met with Cooke and all of the attorneys in a separate courtroom after the opening statements, the trial proceeded without the conflict in objectives being either addressed or resolved. This resulted in the frequent outbursts in front of the jury that defense counsel had predicted. Not only did Cooke testify about his dispute with his defense attorneys about the guilty but mentally ill objective, but on two separate occasions his outbursts on the subject resulted in his attorneys moving for a mistrial, because Cooke's assertion that he was "not guilty" was "highly prejudicial to the defense that *we're* putting on."

The record reflects that Cooke's right to a jury trial was also compromised by his exclusion from the courtroom at the request of his counsel.[56] Although Cooke was removed from the courtroom for outbursts about the conduct of his defense attorneys generally and specifically on occasions when evidence to support the guilty but mentally ill objective was presented, at other times, Cooke's defense attorneys told the judge it would be better for Cooke not to be in the courtroom when they presented the mental illness evidence to the jury over Cooke's objection. Accordingly, despite Cooke's request for a jury trial, the objective of his defense attorneys led to their asking for his exclusion from the courtroom while they presented either evidence or argument that Cooke opposed.

The denial of Cooke's right to a fair trial by an impartial jury on the issue of his guilt is apparent from his defense attorneys' closing argument, during which they told the jury that Cooke's testimony about his innocence was not credible and should not be believed because it was a manifestation of his mental illness. They also told

---

duct her own defense, but also her right to make this defense in person" and "in his or her own words") (citing *Rock v. Arkansas*, 483 U.S. 44, 52–53, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987)).

**55.** *Nixon*, 543 U.S. at 187, 125 S.Ct. 551 (citing *Jones*, 463 U.S. at 751, 103 S.Ct. 3308); *Boykin*, 395 U.S. at 243, 89 S.Ct. 1709; *Duncan*, 391 U.S. at 148–49, 88 S.Ct. 1444.

**56.** *Nixon*, 543 U.S. at 187, 125 S.Ct. 551 (explaining that the right to trial by jury and the right to confront one's accusers are "constitutional rights that inhere in a criminal trial") (citing *Boykin*, 395 U.S. at 243, 89 S.Ct. 1709); *United States v. Ruiz*, 536 U.S. 622, 629, 122 S.Ct. 2450, 153 L.Ed.2d 586 (2002) (explaining that "other accompanying constitutional guarantees" to the right to a fair trial include the Sixth Amendment right to confront one's accusers and right to trial by jury); *Maryland v. Craig*, 497 U.S. 836, 849–50, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990) (explaining that "face-to-face confrontation with witnesses appearing at trial" is important though not "an indispensable element of the Sixth Amendment's guarantee of the right to confront one's accusers"). *But see Illinois v. Allen*, 397 U.S. 337, 342–43, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970) (explaining that the constitutional right to be present at trial was not violated where the trial judge removed the defendant for disruptive behavior).

the jury that Cooke committed the crimes with which he was charged. The defense attorneys then asked the jury to find Cooke guilty but mentally ill.

▉ Moreover, by pursuing the objective of obtaining a guilty but mentally ill verdict during the guilt phase, the defense also compromised the impartiality of Cooke's jury during its *penalty phase* consideration of the statutory aggravating factors that would make Cooke death eligible. Defense counsel hoped that a guilty but mentally ill verdict would give Cooke the advantage of a mental illness mitigating factor as a matter of law during the penalty phase. However, by asking the jury to find Cooke guilty but mentally ill, as charged, defense counsel also asked the jury to find Cooke guilty of all the felonies that established statutory aggravating circumstances as a matter of law.[57] Cooke's assertion of factual innocence disputed not only his guilt, but also his eligibility for the death penalty. His own attorneys affirmatively opposed his assertion of innocence by contending he committed the crimes charged and that his testimony asserting innocence demonstrated mental illness. As result, Cooke's fundamental right to have an impartial jury during both the guilt and the penalty phases was effectively negated by the objective of his defense attorneys to have the jury find him guilty but mentally ill.[58]

4. *Florida v. Nixon does not mandate application of* Strickland *because Cooke adamantly opposed counsel's course of conduct.*

In *Florida v. Nixon*,[59] the United States Supreme Court explained that, although defense counsel is obligated to discuss potential strategies with the defendant, "when counsel informs the defendant of the strategy counsel believes to be in the defendant's best interest *and the defendant is unresponsive,* counsel's strategic choice is not impeded by any blanket rule demanding the defendant's explicit consent." In that case, defense counsel decided that the best strategy was to concede that the defendant had committed murder in the guilt phase of the capital trial, and to concentrate on attempting to spare the defendant's life in the penalty phase. Counsel consulted with and informed the defendant that the strategy was the best way to attempt to avoid a death sentence. The defendant did not respond affirmatively or negatively, and so counsel proceeded with that strategy without the defendant's express consent.[60]

The United States Supreme Court explained that, when a defendant fails to give "express consent" to pursue "a tenable strategy [that] counsel has adequately disclosed to and discussed with the defendant," prejudice is not presumed.[61] Instead, "[t]he reasonableness of counsel's performance, *after consultation with the defendant yields no response,* must be

---

57. *See Steckel v. State*, 711 A.2d 5, 13 (Del. 1998).

58. *Nixon*, 543 U.S. at 187, 125 S.Ct. 551 (citing *Jones*, 463 U.S. at 751, 103 S.Ct. 3308).

59. 543 U.S. 175, 192, 125 S.Ct. 551, 160 L.Ed.2d 565 (2004) (citing *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052) (emphasis added).

60. *Id.* at 186–87, 125 S.Ct. 551. Counsel explained his strategy to the defendant several times and the defendant "did nothing affirmative or negative." *Id.* at 186, 125 S.Ct. 551. Because he could not elicit a definitive response from the defendant, counsel "chose to pursue the concession strategy because, in his professional judgment, it appeared to be the only way to save the defendant's life." *Id.*

61. *Id.* at 179, 125 S.Ct. 551 (citing *Cronic*, 466 U.S. at 659, 104 S.Ct. 2039).

judged in accord with the inquiry generally applicable to ineffective-assistance-of-counsel claims," that is, whether counsel's representation "fell below an objective standard of reasonableness." [62] The court explained that a presumption of prejudice "is not in order based *solely* on a defendant's failure to provide express consent to a tenable strategy counsel has adequately disclosed to and discussed with the defendant." [63]

This case is not like *Nixon*, where the defendant did not respond to counsel's proposed strategy, and neither consented nor objected when his counsel pursued that strategy at trial. In stark contrast to the defendant's silence in that case, Cooke repeatedly objected to his counsel's objective of obtaining a verdict of guilty but mentally ill, and asserted his factual innocence consistent with his plea of not guilty.[64] The Court's holding in *Nixon* that counsel was not required to acquire the defendant's "affirmative, explicit ac-

ceptance" to a tactical decision to concede guilt, was expressly qualified as applying only to the factual scenario in which the defendant is unresponsive to counsel's proposed strategy.[65] However, where, as here, the defendant *adamantly objects* to counsel's proposed objective to concede guilt and pursue a verdict of guilty but mentally ill, and counsel proceeds with that objective anyway, the defendant is effectively deprived of his constitutional right to decide personally whether to plead guilty to the prosecution's case, to testify in his own defense, and to have a trial by an impartial jury.[66] The right to make these decisions is nullified if counsel can override them against the defendant's wishes. In this case, the trial court's failure to address the breakdown in the attorney-client relationship allowed defense counsel to proceed with a trial objective that Cooke expressly opposed. This deprived Cooke of his Sixth Amendment right to make fundamental decisions concerning his case.[67]

**62.** *Id.* at 178, 125 S.Ct. 551 (citing *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052) (emphasis added).

**63.** *Id.* at 179, 125 S.Ct. 551 (citing *Cronic,* 466 U.S. at 659, 104 S.Ct. 2039) (emphasis added).

**64.** We note that a hypothetical was presented during oral argument in *Nixon* with a striking similarity to the facts before us. Justice Souter presented counsel for the United States (as amicus curiae supporting the state of Florida) with a hypothetical defendant who "goes whole hog" in announcing to the jury and the trial judge that he disagrees with his counsel's decision to concede guilt and that he is innocent. Counsel responded that, under those circumstances, alternative counsel should be appointed. Justice Souter agreed, but further inquired whether, if no alternative counsel is appointed, "there is any possibility ... of finding adequacy of counsel?" Counsel responded "Probably not ...." and conceded that this type of situation would "lead to such a breakdown in the attorney-client relationship that [the attorney] couldn't possibly render effective assistance of counsel." Tran-

script of Oral Argument at 22–23, *Nixon,* 543 U.S. 175, 125 S.Ct. 551 (No. 03–931).

**65.** *Nixon,* 543 U.S. at 192, 125 S.Ct. 551.

**66.** *Cf.* Kimberly Helene Zelnick, *In Gideon's Shadow: The Loss of Defendant Autonomy and the Growing Scope of Attorney Discretion,* 30 Am. J.Crim. L. 363, 397–98 (2003) ("Because these rights [enumerated in *Jones'*] are retained for the defendant, counsel should be bound by his client's decisions regarding how he wishes to exercise these rights, and further, counsel should be bound to act in a fashion that is consistent with those decisions."); Peter A. Joy & Kevin C. McMunigal, *Counsel or Client—Who's in Charge?,* 22 Crim. Justice 34, 36 (2008) (explaining that *Nixon* exemplifies a judicial trend that "courts tend to interpret a defendant's silence after consultation with defense counsel as acquiescence to defense counsel's advice or action even when the action may waive a defendant's fundamental right").

**67.** *See Faretta,* 422 U.S. at 819–20, 95 S.Ct. 2525 (explaining that the Sixth Amendment "grants to the accused personally the right to

**848** ■

**B. Cooke was denied the assistance of counsel in his defense.**

■ Generally, we do not consider claims of ineffective assistance of counsel in a direct appeal.[68] The reason for that practice, in part, is to develop a record on that issue in a Superior Court Rule 61 post-conviction proceeding. In Cooke's case, however, the actions of trial counsel are not disputed and are clearly reflected in the Superior Court proceedings.[69] Therefore, the present record is sufficient for this Court to review Cooke's constitutional claims, including the argument that he was denied his Sixth Amendment right to the effective assistance of counsel.[70]

■ To prevail on a claim of ineffective assistance of counsel, a defendant must typically satisfy the two-pronged test set out in *Strickland v. Washington*.[71] First, counsel's performance must have been deficient, meaning that "counsel's representation fell below an objective stan-

dard of reasonableness."[72] Second, if counsel was deficient, there must be "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[73] However, in *United States v. Cronic*,[74] a companion case to *Strickland*, the United States Supreme Court held that there are three scenarios in which the defendant need not satisfy the *Strickland* test, because prejudice is presumed: (1) where there is a complete denial of counsel; (2) where counsel entirely fails to subject the prosecution's case to meaningful adversarial testing; and (3) where counsel is asked to provide assistance in circumstances where competent counsel likely could not. The second circumstance applies in this case.

In *Cronic*, the Court explained what it considered to be "meaningful adversarial testing":

preme Court of Kansas generally does not consider a defendant's assertion of ineffective assistance of counsel before the trial court has had an opportunity to assess counsel's performance, but that such assessment by the trial court is not necessary if the record on appeal is sufficiently complete to decide the issue on direct appeal and it would serve no purpose to remand); *see also United States v. Swanson*, 943 F.2d 1070, 1072–73 (9th Cir. 1991).

70. *Carter*, 14 P.3d at 1144 (stating that "[t]he record on appeal is sufficient for this court to consider [the defendant's] constitutional claims, including ineffective assistance of counsel").

71. 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

72. *Id.* at 688, 104 S.Ct. 2052.

73. *Id.* at 694, 104 S.Ct. 2052.

74. 466 U.S. 648, 659–62, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984).

make his defense"); *see also* 1 GEOFFREY C. HAZARD JR & C. WILLIAM HODES, THE LAW OF LAWYERING § 5.6, illus. 5–3 (3d ed. 2009) (explaining that a criminal defense lawyer who interferes with a client's autonomous choice in the area of critical turning-point decisions is not providing the effective assistance of counsel required by the Sixth Amendment); Joy & McMunigal, *supra* note 66 at 35–36 (noting that some courts have used the *Faretta* holding "as grounds for concluding that the client's right to decide the objectives of representation includes the defenses to be raised and whether mitigation evidence should be introduced") (citing *State v. Hedges*, 269 Kan. 895, 8 P.3d 1259, 1273–74 (2000); *Pruitt v. State*, 270 Ga. 745, 514 S.E.2d 639, 650 (1999); *People v. Frierson*, 39 Cal.3d 803, 218 Cal.Rptr. 73, 705 P.2d 396, 403–04 (1985)).

68. *See, e.g., Desmond v. State*, 654 A.2d 821, 829 (Del.1994); *Wright v. State*, 513 A.2d 1310, 1315 (Del.1986); *Duross v. State*, 494 A.2d 1265, 1269 (Del.1985); *accord* SUPR. CT. R. 8.

69. *See State v. Carter*, 270 Kan. 426, 14 P.3d 1138, 1144 (2000) (explaining that the Su-

The adversarial process protected by the Sixth Amendment requires that the accused have "counsel acting in the role of an advocate." The right to the effective assistance of counsel is thus the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing. When a true adversarial criminal trial has been conducted . . . the kind of testing envisioned by the Sixth Amendment has occurred. But if the process loses its character as a confrontation between adversaries, the constitutional guarantee is violated.[75]

The Court further explained the defendant must show either the deprivation of a constitutional right "of the first magnitude" or "specific errors of counsel [that] undermined the reliability of the finding of guilt." [76]

The United States Supreme Court elaborated on *Cronic's* second exception more recently in *Bell v. Cone.*[77] In that case, the defendant's attorney failed to call witnesses, present available mitigating evidence, or make a closing argument during the penalty phase of the trial, although he did make an opening statement and cross-examine witnesses. The Court explained that in order to "presume[e] prejudice based on an attorney's failure to test the prosecutor's case . . . the attorney's failure must be complete." [78] The Court further explained that in "distinguishing between the rule of *Strickland* and that of *Cronic,* [the] difference is not of degree but of kind," and that this distinction hinges on whether the petitioner alleges a defect in the "proceeding as a whole" or "at specific points" of the trial.[79] Noting that the defendant had alleged only that his counsel failed to introduce certain evidence and waived a closing argument, the Court held that these challenges were "plainly of the same ilk as other specific attorney errors we have held subject to *Strickland's* performance and prejudice components." [80]

■ In this case, when Cooke exercised his ultimate authority to make certain fundamental decisions, his attorneys insisted on their own objective. The enormity of this conflict was accurately summarized by defense counsel during an exchange with the trial judge. They explained that Cooke had been nice and congenial in conversations with his attorneys, *"but in terms of where the two ships are sailing in this litigation, they're not on the same course."* Cooke's overarching strategy was to obtain a verdict of not guilty by presenting evidence that he was factually innocent. Defense counsel had an independent and inconsistent strategy: to obtain a verdict of guilty but mentally ill by conceding Cooke's guilt and introducing evidence of his mental illness during the guilt/innocence phase of the trial. Counsel's override negated Cooke's decisions regarding his constitutional rights, and created a structural defect in the proceedings as a whole.

Unlike the specific allegations at issue in *Cone,* the record in this case demonstrates to us a two-fold breakdown in the adversarial system of justice that pervaded Cooke's entire proceeding.[81] First,

---

**75.** *Id.* at 656–57, 104 S.Ct. 2039 (quoting *Anders v. California,* 386 U.S. 738, 743, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967)); *see also Melendez–Diaz v. Massachusetts,* — U.S. ——, 129 S.Ct. 2527, 2556, 174 L.Ed.2d 314 (2009) (Kennedy J., dissenting).

**76.** *Id.* at 659 & n. 26, 104 S.Ct. 2039.

**77.** 535 U.S. 685, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002).

**78.** *Id.* at 696–97, 122 S.Ct. 1843 (citing *Cronic,* 466 U.S. at 659, 104 S.Ct. 2039).

**79.** *Id.* at 697, 122 S.Ct. 1843.

**80.** *Id.* at 697–98, 122 S.Ct. 1843.

**81.** *Swanson,* 943 F.2d at 1072–73; *see also Cronic,* 466 U.S. at 656–59, 104 S.Ct. 2039.

Cooke's attorneys did not "assist" Cooke with his trial objective of obtaining a not guilty verdict.[82] Second, in pursuing their own inconsistent objective of proving that Cooke was guilty but mentally ill, defense counsel not only failed to subject the prosecution's case to meaningful adversarial testing, but also undermined the due process requirement that the State prove Cooke's guilt—and his eligibility for the death penalty—beyond a reasonable doubt.[83] The defense attorneys introduced Cooke's confession to Dr. Turner, argued to the jury that Cooke's testimony was not credible, and told the sentencing judge and the jury that Cooke committed the crimes. Thus, on the issues of his guilt and his eligibility for a death sentence—the elements of capital murder—Cooke's defense attorneys' alignment with the prosecutors was complete.[84] Indeed, Cooke's attorneys helped the prosecution by introducing evidence against Cooke that was beyond the reach of the prosecutors.

■■■ "The assistance of counsel is among those constitutional rights so basic to a fair trial that their denial can never be treated as harmless error."[85] The conduct

of Cooke's defense attorneys was inherently prejudicial and does not require a separate showing of prejudice, because Cooke's counsel negated his basic trial rights and "failed to function in any meaningful sense as the [prosecution's] adversary."[86] Although done in good faith, defense counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. Accordingly, we find no other alternative except to grant Cooke a new trial.

C. *The trial court had a duty to inquire into the propriety of the representation.*

■■■ Every criminal defendant is presumed to be innocent and is entitled to a fair trial.[87] The trial judge has a duty to see that a defendant is "denied no necessary incident of a fair trial."[88] This includes ensuring "that the jury will accord the defendant the full benefit of the reasonable doubt standard."[89] By refusing to address Cooke's express opposition to his counsel's pursuit of a guilty but mentally

---

**82.** *Cronic*, 466 U.S. at 659, 104 S.Ct. 2039.

**83.** *Id.* at 654 n. 8, 104 S.Ct. 2039 (quoting *Powell*, 287 U.S. at 68–69, 53 S.Ct. 55).

**84.** *Carter*, 14 P.3d at 1146 (quoting *Swanson*, 943 F.2d at 1071 (concluding that "we must reverse because counsel's abandonment of his client's defense [by conceding the only disputed facts in closing argument] caused a breakdown in our adversarial system of justice")).

**85.** *Id.* at 1148 (quoting *State v. Jenkins*, 257 Kan. 1074, 898 P.2d 1121, 1127–28 (1995)).

**86.** *Cronic*, 466 U.S. at 666, 104 S.Ct. 2039; *Carter*, 14 P.3d at 1145 (citing *Cronic*, 466 U.S. at 666, 104 S.Ct. 2039); *see* Zelnick, *supra* note 66, at 395–97 (advocating application of *Cronic* "when counsel overrides a defendant's decision regarding how the defendant wishes to exercise his personal con-

stitutional rights, counsel has ceased to function as his client's advocate, and the bargain struck by the *Jones* Court has been corrupted.").

**87.** *Powell*, 287 U.S. at 58, 53 S.Ct. 55.

**88.** *Id.* ("However guilty defendants, upon due inquiry, might prove to have been, they were, until convicted, presumed to be innocent. It was the duty of the court having their cases in charge to see that they were denied no necessary incident of a fair trial.").

**89.** *Weber*, 971 A.2d at 142–43; (holding that the trial judge committed reversible error when he refused the defendant's request for an instruction on a lesser-included offense that was merited by the evidence, because the defendant was denied "the full benefit of the reasonable doubt standard") (quoting *Beck v. Alabama*, 447 U.S. 625, 634, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980)).

ill verdict, the trial court failed to protect Cooke's right to a fair trial.[90]

The decision to pursue a verdict of not guilty and assert his factual innocence belongs to the defendant.[91] The record before us reflects that Cooke was deprived of the opportunity to meaningfully oppose the prosecution's case.[92] His counsel's strategy to pursue a verdict of guilty but mentally ill, which included introducing a confession Cooke disputed, undermined Cooke's right to plead not guilty, to testify at trial and assert his innocence, and to present his chosen plea to the jury.[93] We have previously concluded that this strategy constituted attorney error which effectively denied Cooke the assistance of counsel and his fundamental trial rights.[94] The trial judge also erred by failing to intervene and provide a remedy for this error, notwithstanding Cooke's explicit requests.[95]

Even though the trial court knew that Cooke had entered a plea of not guilty, opposed the guilty but mentally ill strategy, and wanted to testify that he was innocent so that he could receive the full benefit of the reasonable doubt standard in a trial by a jury, the trial court permitted defense counsel to seek a verdict of guilty but mentally ill, introduce Cooke's disputed confession, and concede Cooke's guilt to the jury, so that the only jury issue was whether Cooke was mentally ill. The inherent prejudice to Cooke, and defense counsel's prediction of a "disastrous happening" as a result of their conflict with Cooke, required intervention by the trial court.

▮▮▮ Defense counsel's strategy, and the trial court's refusal to address their conflict with Cooke, resulted in "complete chaos at trial."[96] Cooke's counsel sat at one side of the defense table, arguing that Cooke was guilty but mentally ill, and Cooke sat at the other side, arguing that he was factually innocent and not mentally ill. Cooke repeatedly stated that he was not guilty, and that he did not want his attorneys to present evidence to support a verdict of guilty but mentally ill. He was

90. *See Cuyler,* 446 U.S. at 336, 100 S.Ct. 1708.

91. *Cf. Red Dog v. State,* 620 A.2d 848, 853–54 (Del.1993). In *Red Dog,* the defendant sought to obtain an execution without any contest; however, his defense attorneys filed a motion to stay the execution over the defendant's repeated and consistent objections. We held that, absent a showing of the defendant's incompetence, the public defenders did not have standing to file such a motion "in derogation of his express directions to the contrary." *Id.* To the extent the dissent argues that *Red Dog* is inapposite because it concerned a defendant's right to take or refuse to take an appeal, we note that the decision whether to file an appeal, like the decision to plead guilty, waive a jury, or testify in his or her own behalf, is a fundamental decision reserved for the defendant. *See Jones,* 463 U.S. at 751, 103 S.Ct. 3308; *see also Nixon,* 543 U.S. at 187, 125 S.Ct. 551; *Wainwright,* 433 U.S. at 93 n. 1, 97 S.Ct. 2497; *accord In re Petition of State,* 918 A.2d at 1154.

92. *Cronic,* 466 U.S. at 659, 104 S.Ct. 2039.

93. *Nixon,* 543 U.S. at 187, 125 S.Ct. 551.

94. *Id.; Cronic,* 466 U.S. at 656, 104 S.Ct. 2039.

95. *See Faretta,* 422 U.S. at 848, 95 S.Ct. 2525 (Blackmun, J., with Burger, C.J., and Rehnquist, J., dissenting) (arguing against the majority's holding that the Sixth Amendment guarantees an absolute right to self-representation by explaining that "[t]his is not a case where defense counsel, *against the wishes of the defendant* or with inadequate consultation, has adopted a trial strategy that significantly affects one of the accused's constitutional rights. For such overbearing conduct by counsel, there is a remedy.").

96. *Lowenfield v. Phelps,* 817 F.2d 285, 292 (5th Cir.), *aff'd on other grounds,* 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988).

entitled to have his attorneys follow these directions.[97] Instead, the prosecutors and his own counsel simultaneously opposed him. The trial court was aware of these significant issues as early as the pre-trial conference. The conflict between Cooke and his attorneys manifested itself throughout the trial through Cooke's numerous outbursts, culminating in his testimony during the guilt/innocence phase, when he stated: "These counsel have misrepresented me so bad. They have railroad me through this whole thing.... I been got rid of these public defenders. I fired them a long time ago. The judge allowed me to keep them."

■ When defense counsel decides to concede not only guilt, but also eligibility for the death penalty over the defendant's express objection, the trial judge has an obligation to inquire into the propriety of counsel's representation. A strategy that Cooke was guilty but mentally ill is incompatible with factual innocence. In this instance, the trial judge's obligation to ensure that the defendant receives a fair trial required the trial judge to instruct counsel not to pursue a verdict of guilty but mentally ill against Cooke's wishes. The trial court's failure to provide this remedy denied Cooke his right to a fair trial.

Finally, we respectfully address our colleagues' dissent which concludes (1) that a *Strickland* analysis applies, and (2) that under that analysis, counsel satisfied Cooke's Sixth Amendment right to reasonably effective assistance of counsel. We agree with the Dissent that *Florida v.*

*Nixon* does not reach the facts of this case.[98] We also recognize, as the Dissent does, the challenges defense counsel face in a capital case. Indeed, a capital case is the most challenging of criminal cases for everyone involved. But these challenges cannot justify infringement of a defendant's personal and fundamental right to plead not guilty, to testify in his own defense, and to have the issue of guilt determined by an impartial jury. Only the defendant may waive these rights, which are personal to him.

If we focus, as the Dissent has, upon the reality of a capital murder trial, that reality includes the likelihood that no jury will give fair consideration to a defendant's plea of not guilty, his sworn denial of guilt, or enforce the requirement of proof beyond a reasonable doubt, when a defendant's own counsel act against his wishes and argue he is guilty, introduce evidence that incriminates him, and thereby prove his eligibility for a death sentence. The plain language of the Sixth Amendment confers the right to "the Assistance of Counsel for his defence." Cooke was effectively left without counsel during his testimony and throughout the proceedings on the critical issues of his guilt and his eligibility for the death penalty. In our view, the wide range of reasonable professional assistance allowed under *Strickland* does not contemplate such a structural defect so inherently prejudicial to the adversarial process and a fair trial. Instead, *Cronic* applies and the rationale of that case requires us to reverse.[99]

---

**97.** *See Red Dog,* 620 A.2d at 853–54; *Lowenfield,* 817 F.2d at 285.

**98.** "In placing heavy emphasis on the client's refusal to make a choice, the *Nixon* Court arguably was reserving for another day the question of whether the counsel could have insisted upon the strategy if the client has opposed it." WAYNE R. LaFAVE ET AL, CRIMINAL PROCEDURE § 11.6(b) (3d ed. 2007).

**99.** *Cronic,* 466 U.S. at 658, 104 S.Ct. 2039 (Explaining that the three exceptions to the *Strickland* analysis represent "circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified.").

The Dissent's assertion that *Cronic* does not apply to the facts of this case is primarily based on its analysis of five factors that the Dissent contends are relevant to analyzing whether counsel failed to subject the State's case to meaningful adversarial testing: time afforded for investigation and preparation; experience of counsel; gravity of the charge; complexity of possible defenses; and accessibility of witnesses. The Dissent's reliance on these factors is misplaced. In *Cronic*, the United States Supreme Court criticized the Sixth Circuit's use of the factors (which were created by the Sixth Circuit), and later explained that, while "relevant to an evaluation of a lawyer's effectiveness in a particular case ... neither separately nor in combination do they provide a basis for concluding that competent counsel was not able to provide this respondent with the guiding hand that the Constitution guarantees."[100] Moreover, to the extent *Cronic* could be read as endorsing these factors, the Court addressed them only in the context of whether "circumstances surrounding the [defendant's] representation" justified a "presumption that his conviction was insufficiently reliable to satisfy the Constitution."[101] They were expressly not applied to analyze whether the defendant "was denied the presence of counsel at a critical stage of the prosecution" or whether "based on the actual conduct of the trial, that there was a breakdown in the adversarial process."[102]

While we agree that "death is different," we do not agree with the Dissent's analysis that the wide discretion given defense counsel permitted the strategy in this case against Cooke's wishes. Cooke's ultimate authority to exercise his fundamental

rights under *Jones* was personal to him. It is all the more important in a capital case for the court to protect these fundamental rights, otherwise, all defendants *but* capital defendants would have them. Cooke's attorneys were constitutionally bound to respect the choices Cooke was entitled to make under *Jones*.

We also disagree with the Dissent's public policy argument. The short answer to the "detrimental public policy considerations" enumerated by the Dissent is that the fundamental rights we have explained are personal to the defendant and are not subject to these considerations. Every defendant, including Cooke, is entitled to a fair trial with the assistance of counsel necessary to justify reliance on the outcome. The Dissent describes the evidence as "overwhelming" but "[w]hether a man is innocent cannot be determined from a trial in which ... denial of counsel has made it impossible to conclude, with any satisfactory degree of certainty, that the defendant's case was adequately presented."[103] Given the failure of the adversarial process in this case, there is no other alternative except to grant a new trial.

## IV. The Motion to Suppress Evidence.

Because a new trial is required, we will address Cooke's claim that the trial court erred in admitting evidence from the search of his residence at 9 Lincoln Drive. Cooke moved to suppress this evidence, arguing that several items were seized that fell outside the scope of the warrant and that, to the extent the State relies on the consent of Campbell to the search, her consent was not voluntary. Cooke also claims that several items were seized that were outside the scope of Campbell's con-

---

**100.** *Id.* at 652–53, 663, 104 S.Ct. 2039.

**101.** *Id.* at 662, 104 S.Ct. 2039; *see also id.* at 663–66, 104 S.Ct. 2039 (addressing the inadequacy of the five factors).

**102.** *Id.* at 662, 104 S.Ct. 2039

**103.** *Betts v. Brady*, 316 U.S. 455, 476, 62 S.Ct. 1252, 86 L.Ed. 1595 (1942) (Black, J., dissenting)

sent. The trial judge denied Cooke's motion to suppress evidence.

■ We review the grant or denial of a motion to suppress for an abuse of discretion.[104] "To the extent the trial judge's decision is based on factual findings, the Court reviews for whether the trial judge abused his or her discretion in determining whether there was sufficient evidence to support the findings and whether those findings were clearly erroneous."[105] To the extent that this Court examines the trial judge's legal conclusions, we review *de novo* for errors in formulating or applying legal precepts.[106] Any claims Cooke raised in the Superior Court that are not raised on appeal are deemed abandoned.[107]

A. *Certain types of searches and seizures are excluded from the Fourth Amendment's probable cause and warrant requirements.*

■ In *Katz v. United States*,[108] the Supreme Court stated a basic constitutional rule that warrantless searches "are *per se* unreasonable under the Fourth Amend-

ment—subject to a few specifically established and well-delineated exceptions." The Fourth Amendment requires that a warrant be supported by probable cause and describe with "particular[ity] ... the place to be searched and the persons or things to be seized."[109] This limitation safeguards the individual's privacy interest against "the wide-ranging exploratory searches the Framers [of the Constitution] intended to prohibit."[110] As a general rule, police are precluded from seizing articles that are not specifically described in the search warrant.[111]

■ However, certain types of searches and seizures are valid exceptions to the probable cause and warrant requirements; these include seizures of items in plain view and consent searches. Police officers may seize evidence that is in plain view without a warrant, provided two criteria are satisfied.[112] First, the police must not "violate the Fourth Amendment in arriving at the [place] from which the evidence could be plainly viewed."[113] Thus, police may lawfully seize evidence in plain view when executing a search warrant[114] or when conducting a lawful war-

---

**104.** *See Lopez–Vazquez v. State,* 956 A.2d 1280, 1284 (Del.2008); *Culver v. State,* 956 A.2d 5, 10 (Del.2008); *Flonnory v. State,* 893 A.2d 507, 515 (Del.2006).

**105.** *Lopez–Vazquez,* 956 A.2d at 1285; *Chavous v. State,* 953 A.2d 282, 286 n. 15 (Del. 2008).

**106.** *Lopez–Vazquez,* 956 A.2d at 1284–85; *Chavous,* 953 A.2d at 286 n. 15.

**107.** *Somerville v. State,* 703 A.2d 629, 631 (Del.1997).

**108.** 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *see also Terry v. Ohio,* 392 U.S. 1, 20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) ("[P]olice must, whenever practicable, obtain advance judicial approval of searches and seizures through the warrant procedure.").

**109.** U.S. Const, amend. IV; *see also Marron v. United States,* 275 U.S. 192, 196, 48 S.Ct. 74, 72 L.Ed. 231 (1927).

**110.** *Maryland v. Garrison,* 480 U.S. 79, 84, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987); *see also Marron,* 275 U.S. at 196, 48 S.Ct. 74.

**111.** *Garrison,* 480 U.S. at 84, 107 S.Ct. 1013; *Marron,* 275 U.S. at 196, 48 S.Ct. 74.

**112.** *See Coolidge v. New Hampshire,* 403 U.S. 443, 467, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) (plurality opinion); *see also Williamson v. State,* 707 A.2d 350, 358 (Del.1998).

**113.** *Horton v. California,* 496 U.S. 128, 136, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990).

**114.** *See Coolidge v. New Hampshire,* 403 U.S. 443, 465, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) (plurality opinion) (holding officers'

rantless search.[115] Second, the incriminating character of the evidence seized must be immediately apparent, and police may not disturb or further investigate an item to discern its evidentiary value without probable cause.[116] These types of warrantless seizures are valid even if the officers fully expected to find the seized evidence.[117]

 In addition to the plain view exception, police officers may also conduct a search and seizure without probable cause or a warrant based upon an individual's voluntary consent.[118] Consent may be express or implied, but this waiver of Fourth Amendment rights need not be knowing and intelligent.[119] To determine whether consent was given voluntarily, courts examine the totality of the circumstances surrounding the consent, including (1) knowledge of the constitutional right to refuse consent; (2) age, intelligence, education, and language ability; (3) the degree to which the individual cooperates with police; and (4) the length of detention and the nature of questioning, including the use of physical punishment or other coercive police behavior.[120] Generally, anyone having a reasonable expectation of privacy in the place being searched may consent to a warrantless search, and any person with common authority over, or other sufficient relationship to, the place or effects being searched can give valid consent.[121]

B. *The search of Cooke's residence.*

In this case, while Cooke was being investigated as a suspect for the murder of Bonistall, the lead investigator, Detective Rubin, determined that Cooke was also wanted on an outstanding warrant for his arrest. After calling on Campbell—Cooke's girlfriend—several times at 9 Lincoln Drive, Cooke's last known address, Detective Rubin obtained a search warrant for that address for the purpose of determining Cooke's whereabouts.[122] The war-

---

presence for plain view seizure purposes justified by search warrant); *see also United States v. Menon*, 24 F.3d 550, 559 (3d Cir.1994) (holding officers' presence for plain view seizure of documents in desk justified by search warrant for documents).

115. *Texas v. Brown*, 460 U.S. 730, 739, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983) (holding plain view seizure of balloon filled with narcotics valid because officers were conducting investigatory detention of automobile at routine driver's license checkpoint); *Washington v. Chrisman*, 455 U.S. 1, 7, 102 S.Ct. 812, 70 L.Ed.2d 778 (1982) (holding plain view seizure of contraband valid because police officer was lawfully on premises incident to valid arrest); *Coolidge*, 403 U.S. at 465, 91 S.Ct. 2022 (holding plain view seizure valid because officers were on premises during hot pursuit).

116. *Arizona v. Hicks*, 480 U.S. 321, 322, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987).

117. *See Horton*, 496 U.S. at 137–41, 110 S.Ct. 2301; *see also Menon*, 24 F.3d at 560 (holding seizure of items in plain view valid though items not discovered inadvertently).

118. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *United States v. Givan*, 320 F.3d 452, 459 (3d Cir.2003) (holding motorist voluntarily consented to search of vehicle when officer told him he was free to go, search occurred in daylight, and motorist said he had nothing to hide).

119. *See Schneckloth*, 412 U.S. at 241, 93 S.Ct. 2041.

120. *See id.* at 226, 93 S.Ct. 2041; *see also United States v. Mendenhall*, 446 U.S. 544, 558, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). *See generally Annual Review of Criminal Procedure*, 36 Geo. L.J. Ann. Rev.Crim. Proc. 83–89 (2007) (citing cases).

121. *See Illinois v. Rodriguez*, 497 U.S. 177, 181–82, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990); *United States v. Matlock*, 415 U.S. 164, 171, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974)

122. *See State v. Cooke*, 2006 WL 2620533, at * 14–15 (Del.Super.Ct. Sept.8, 2006).

rant authorized the police to search at that address for "any and all paperwork or information, electronic or otherwise that would indicate the whereabouts of James Cooke, including: Caller ID devices and cellular telephone address book contact information." [123]

When police conducted the search, Campbell, who was nine months pregnant, was present with her three children. While some officers were searching the residence, Detective Rubin interviewed Campbell in her living/dining room. Because of the distractions at the house, Detective Rubin asked Campbell to accompany him to the police department to finish the interview. Upon returning to 9 Lincoln Drive about midnight, Campbell gave the police her consent to take and seize items the police had located that had immediate evidentiary value, but that may not have squarely fallen within the scope of the search warrant.[124] The consent provided "I further authorize ... the Newark Police Department to remove any letters, documents, papers, materials or other property which is considered pertinent to the investigation, provided that I am subsequently given a receipt for anything which is removed." [125]

Cooke challenges the following items taken, which the Superior Court found had been seized pursuant to Campbell's voluntary consent: (1) a pair of blue and white men's shoes; (2) a composition book; (3) a cassette tape; (4) three disposable cameras; (5) a Nokia cell phone; and (6) a bicycle, because they were outside the scope of the warrant and not listed on the consent form signed by Campbell.

**C.** *The court did not err in concluding that the challenged items were within the scope of consent given by Campbell.*

■■■ Although the challenged items were not on the consent form, Campbell testified at the suppression hearing that she consented to the police taking those items as well.[126] Nevertheless, Cooke argues that the court erred in determining that the State satisfied its burden to prove by a preponderance of the evidence that Campbell's consent was voluntary. He asserts that before the search of her home, Campbell had exchanges with the Newark police which left her upset with how she was treated. He also notes that during the search, Campbell was interviewed by Detective Rubin in her dining room and, at some point, Campbell testified that an FBI agent told her "she could do it the easy way or the hard way" and threatened that if she did not go willingly back to the police station for further questioning, she could be arrested and that her children could be taken from her. Detective Rubin gave a slightly different version, stating that the FBI agent did not say anything to Campbell until they were at the police station.[127]

In fact, Campbell was not arrested, and she went willingly to the police station. She sat in the front seat of the police car and was not handcuffed. While at the police station, she was told that she would be videotaped. Campbell was provided water and testified that she was comfortable throughout the interview. She further testified that she felt comfortable leaving her children at home with the other police detectives, that she never felt threatened

---

**123.** *Id.* at * 14, 19.

**124.** *Id.* at * 15–18.

**125.** *Id.* at * 18.

**126.** *Id.* at * 18.

**127.** *Id.* at * 16, 17.

by Detective Rubin, and that she made all of her statements voluntarily.

Given the totality of the circumstances, we conclude that the record supports the trial court's determination that Campbell voluntarily consented to the search and seizure of the challenged items. She was informed of her right to refuse to consent. Campbell was over eighteen and there was no evidence that she lacked the intelligence, education, or language ability to validly give consent. In addition, Campbell at all times cooperated with the police officers, willingly answering questions at her home and then willingly accompanying the officers to the police station. The evidence indicates that while detained and questioned by police, Campbell was not physically abused or subjected to coercive police behavior. Although there was testimony from Campbell that she was told she could get in trouble if she was covering up for Cooke, Campbell also testified that she went willingly to the police station and was not pressured to cooperate. The trial court found her consent to be voluntary,[128] and that finding is supported by the evidence.

The cases relied upon by Cooke are distinguishable. In *Bumper v. North Carolina*,[129] a consent search was invalidated due to the fact that the searching officers represented they had a warrant, when in fact, none existed. In *United States v. Johnson*,[130] the Ninth Circuit invalidated a consent search where the officers concealed their true identity as a way to gain entry into the residence. These cases are inapposite to the facts of this case. Because the Superior Court's factual findings are supported by sufficient evidence and the court did not err in applying legal precepts, Cooke's motion to suppress was properly denied.[131]

## V. Conclusion

The judgment of the Superior Court is **REVERSED** and this matter is **REMANDED** for a new trial.

STEELE, Chief Justice and JACOBS, Justice dissenting:

While we commend our colleagues for their exhaustive effort in scrutinizing the record in this case, we fundamentally disagree with their core analysis—a holding that *U.S. v. Cronic*,[132] not *Strickland v. Washington*,[133] is the template for resolving the knotty problem of determining whether counsel's defensive strategy so sharply contrasted with Cooke's expressed objective that the strategy deprived Cooke of his right to reasonably effective assistance of counsel. In our view, the Majority fails to come to grips with the reality that "death is different" and that the guilt and penalty phases are so inextricably intertwined, that counsel's effectiveness must be scrutinized with the specter of death as the omnipresent backdrop.

128. *Id.* at * 27.

129. 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968).

130. 626 F.2d 753 (9th Cir.1980).

131. The State also argues that the plain view exception should apply to these items because they were seized by officers who were lawfully in the place from which the evidence was in plain view, and each item had immediate evidentiary value. However, the Superior Court found that it had no evidentiary basis on which to rule on the plain view issue because the officer who seized most of the items at issue did not testify at the suppression hearing. *Cooke*, 2006 WL 2620533, at * 27. The court did not abuse its discretion in refusing to rule on whether the seizures comported with the plain view exception.

132. 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984).

133. 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

While the Majority believes that defense counsel's strategy undermined Cooke's objective and deprived Cooke of the right to make fundamental decisions, we believe defense counsel pursued an appropriate strategy while upholding all of Cooke's fundamental rights.

We dissent because: (1) we conclude that a *Strickland* analysis applies; and (2) under a *Strickland* analysis, counsel satisfied Cooke's Sixth Amendment right to reasonably effective assistance of counsel. We also conclude that the issue of effective assistance of counsel, albeit inconsistent with our usual practice, can be resolved in this appeal based on the established record.[134] We, therefore, would affirm Cooke's convictions.

### Strickland Controls When Counsel Chooses a Legal Strategy

In *Strickland v. Washington*, the United States Supreme Court held that under the Sixth Amendment, the defendant has a right to reasonably *effective* assistance of counsel.[135] The Court there emphasized that "[t]he benchmark for judging any claim of ineffectiveness must be whether

counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."[136] To establish that counsel violated his Sixth Amendment right, a defendant must demonstrate not only that counsel's performance was deficient but also that the deficiency was "so serious as to deprive [him] of a fair trial."[137] Judicial scrutiny of counsel's performance is highly deferential, and any "ineffectiveness claim must consider the totality of the evidence before the judge or jury."[138]

Generally, there is a presumption of defense counsel's competence, with the burden to establish a Sixth Amendment violation resting on the defendant.[139] In *U.S. v. Cronic*, however, the U.S. Supreme Court held that a Sixth Amendment violation is presumed where "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing" or where there are "circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified."[140] The *Nixon* Court specifically recognized the presumption of a violation

---

**134.** We do agree with the Majority's holding on the trial judge's ruling on the Motion to Suppress.

**135.** *See Strickland*, 466 U.S. at 686, 104 S.Ct. 2052 (1984) (citing *McMann v. Richardson*, 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970)) (emphasis added); *see also, e.g., Roe v. Flores–Ortega*, 528 U.S. 470, 476, 120 S.Ct. 1029, 145 L.Ed.2d 985 (2000); *Trapnell v. U.S.*, 725 F.2d 149, 151–52 (2d Cir.1983).

**136.** *Strickland*, 466 U.S. at 686, 104 S.Ct. 2052. The Majority also cites *Strickland* for this proposition and appears, at least initially, to believe a "just result" to be the ultimate test for counsel's effectiveness.

**137.** *Id.* at 687, 104 S.Ct. 2052; *see also Cronic*, 466 U.S. at 656, 104 S.Ct. 2039 ("[I]f the process loses its character as a confrontation between adversaries, the constitutional guarantee is violated.").

**138.** *Strickland*, 466 U.S. at 695, 104 S.Ct. 2052. Courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689, 104 S.Ct. 2052.

**139.** *Staats v. State*, 961 A.2d 514, 518 (Del. 2008) (citing *Flamer v. State*, 585 A.2d 736, 753–54 (Del.1990)); *see also Michel v. Louisiana*, 350 U.S. 91, 100–01, 76 S.Ct. 158, 100 L.Ed. 83 (1955).

**140.** *Cronic*, 466 U.S. at 659, 104 S.Ct. 2039. "[I]f counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable." *Id.*; *see also Bell v. Cone*, 535 U.S. 685, 696–97, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002) (holding that "the attorney's failure must be complete").

only where there is a "complete denial of counsel" [141] to the defendant or where counsel is "either totally absent, or prevented from assisting the accused during a critical stage of the proceeding." [142]

In *Florida v. Nixon*, the U.S. Supreme Court held that *Strickland*, rather than *Cronic*, was the appropriate standard for reviewing defense counsel's failure "to obtain the defendant's express consent to a strategy of conceding guilt in a capital trial." [143] The Court began its analysis by noting that, although counsel "has a duty to consult with the client regarding 'important decisions,' including questions of overarching defense strategy[,]" [144] counsel need not "obtain the defendant's consent to 'every tactical decision.'" [145] The Court distinguished the strategic choice of *conceding guilt in the guilt phase*, which may be "tactically advantageous for the defendant," from *actually pleading guilty*. The latter choice, unlike the former, waives the defendant's constitutional rights to "trial by jury, the protection against self-incrimination, and the right to confront one's accusers." [146] The Court concluded that "counsel lacks authority to consent to a guilty plea on a client's behalf" [147] and that

"a defendant's tacit acquiescence in the decision to plead is insufficient to render the [guilty] plea valid." [148]

The *Nixon* Court distinguished a concession of guilt—where the defendant "retain[s] the rights accorded a defendant in a criminal trial" including the rights to "cross-examine witnesses for the prosecution . . . [to] endeavor . . . to exclude prejudicial evidence" and the right to appeal "in the event of errors in the trial or jury instructions"—from a guilty plea, where the prosecution need not present evidence "establishing the essential elements of the crimes with which [the defendant] was charged." [149] The Court pointedly refused, however, to require a defendant's "affirmative, explicit acceptance" of counsel's tactical decision to concede guilt, because conceding guilt is not "the equivalent of a guilty plea." [150]

Although in *Nixon*, the U.S. Supreme Court concluded that *Strickland* applies where a defendant neither expressly consents nor expressly objects to his counsel's tactical decision to concede guilt,[151] the Court did not address whether the *Strickland* standard applies where—as here—

141. *Cronic,* 466 U.S. at 659, 104 S.Ct. 2039.

142. *Id.* at 659 n. 25, 104 S.Ct. 2039 (citations omitted).

143. *Florida v. Nixon,* 543 U.S. 175, 186–87, 125 S.Ct. 551, 160 L.Ed.2d 565 (2004).

144. *Id.* at 187, 125 S.Ct. 551 (quoting *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052). "A defendant . . . has 'the ultimate authority' to determine 'whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal.'" *Id.* (quoting *Jones v. Barnes,* 463 U.S. 745, 751, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983); *Wainwright v. Sykes,* 433 U.S. 72, 93 n. 1, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977)).

145. *Id.* (quoting *Taylor v. Illinois,* 484 U.S. 400, 417–18, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988)).

146. *Id.* (citing *Boykin v. Alabama,* 395 U.S. 238, 240, 242–43, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969)).

147. *Id.* (citing *Brookhart v. Janis,* 384 U.S. 1, 6–7, 86 S.Ct. 1245, 16 L.Ed.2d 314 (1966)).

148. *Id.* at 188, 125 S.Ct. 551 (citing *Boykin,* 395 U.S. at 242, 89 S.Ct. 1709).

149. *Id.*

150. *Id.* at 188–89, 125 S.Ct. 551 (citing *Brookhart,* 384 U.S. at 7, 86 S.Ct. 1245 (holding that a "prima facie" bench trial, relieving the prosecution of its burden of proof beyond a reasonable doubt, is the equivalent of a guilty plea)).

151. *See id.* at 189, 191, 125 S.Ct. 551.

the defendant clearly and consistently objects to counsel's defense strategy. Unlike the defendant in *Nixon*, Cooke consistently and expressly objected to his counsel's presenting a Guilty But Mentally Ill (GBMI) defense. Thus, *Nixon*, does not reach the facts of this case.

It is at this juncture that we and the Majority part company. *Nixon* holds that "... a lawyer must both consult with the defendant and obtain consent to the recommended course of action" concerning "whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal." [152] That is all that *Nixon* holds. The Majority, however, extends *Nixon* to support their claim that, even though Cooke's counsel consulted and obtained Cooke's consent concerning his fundamental rights, counsel "undermine[d]" and "deprived Cooke of his constitutional right to make fundamental decisions regarding his case." The Majority must rely on their expanded *Nixon* holding to construct support for their foundational proposition— counsel is *per se* ineffective if counsel fails to pursue the innocence "objective" that they believe follows from pleading not guilty—even where asserting innocence at trial despite overwhelming evidence to the contrary would enhance the risk of receiving the death penalty. The Majority's proposition (and expansive interpretation of *Nixon* ) is flawed because a defendant's choice to plead not guilty may result in either asserting innocence or challenging the State to prove guilt beyond a reasonable doubt. In this case, Cooke's counsel pursued this latter corollary objective of pleading not guilty, while at the same time

they presented a strategy of using GBMI in order to save their client's life. We must decide, therefore, with little guidance from federal case law, whether *Strickland* or *Cronic* applies where the defendant explicitly disagrees with counsel over defensive strategy.

In our view, *Strickland*, not *Cronic*, should apply to this situation, because *Cronic* applies only where counsel does *nothing* or *next to nothing* to discharge his duty to present a vigorous defense.[153] *Cronic* is an exception to *Strickland*, and permits a presumption of a Sixth Amendment violation only where there is a "complete denial of counsel," where counsel is absent or is prevented from assisting the defendant during a critical stage of the proceeding, or where counsel fails to subject the prosecution's case to "meaningful adversarial testing." [154] None of these circumstances is presented here.

### In Capital Cases Involving Overwhelming Evidence of Guilt, Counsel Satisfies the Sixth Amendment by Subjecting the State's Case to an Adversarial Process

To establish a Sixth Amendment violation under *Cronic's* standard, the accused bears the burden of proving that counsel entirely failed to subject the State's case to a meaningful adversarial process.[155] In *Cronic*, the U.S. Supreme Court held that the following factors are relevant to analyzing counsel's effectiveness: the time afforded for investigation and preparation; experience of counsel; the gravity of the charge; the complexity of possible defenses; and the accessibility of witnesses.[156]

**152.** *Id.* at 187, 125 S.Ct. 551.

**153.** *Id.* at 189, 125 S.Ct. 551 (holding that *Cronic* is "reserved for situations in which counsel has entirely failed to function as the client's advocate."); *see also Bell v. Cone*, 535 U.S. 685, 696–97, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002).

**154.** *See U.S. v. Cronic*, 466 U.S. 648, 659–62, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984).

**155.** *Id.* at 659, 104 S.Ct. 2039.

**156.** *Id.* at 663–66, 104 S.Ct. 2039.

"The five factors ... are relevant to an evaluation of a lawyer's effectiveness in a particular case, but neither separately nor in combination do they provide a basis for concluding that competent counsel was not able to provide [the defendant] with the guiding hand that the Constitution guarantees."[157]

To satisfy the Sixth Amendment requirement of effective assistance, "counsel must function as an advocate for the defendant, as opposed to a friend of the court."[158] *Cronic*, however, limited counsel's duty as an advocate in cases where there is "no bona fide defense to the charge."[159] The Court specifically recognized that "counsel cannot create [a defense] and may disserve the interest of his client by attempting a useless charade."[160]

In *Nixon*, a heinous capital murder case involving overwhelming evidence against the defendant, the U.S. Supreme Court recognized that defense counsel must consider both the guilt and penalty phases in determining how best to proceed.[161] The Court reasoned that, where the evidence is overwhelming and the crime atrocious, "avoiding execution may be the best and only realistic result possible."[162] Given overwhelming evidence of guilt, the best *defense* may be to present a case that is the functional equivalent of a plea for a life sentence, while at the same time testing the prosecution's case yet not running the risk by professing innocence of increasing the chances of the death penalty.[163] Supportive of that reality are the ABA's *Guidelines for Appointment and Performance of Defense Counsel in Death Penalty Cases*, which suggest that "[i]deally, the theory of the trial must complement, support, and lay a groundwork for the theory of mitigation."[164] In certain cases, to preserve credibility in the penalty phase, defense counsel must avoid making fruitless and potentially harmful arguments during the guilt phase.[165]

It is well settled that in capital cases defense counsel can concede guilt as a trial tactic in the guilt phase, to preserve credibility in the penalty phase, where the defendant knows of the tactic and does not expressly object to it.[166] Counsel, however, must consult with the defendant concerning the overall defense strategy.[167] That said, the defendant's consent to every tactical decision is not required.[168] Conceding guilt alone does not violate a fundamental right. Indeed, as the U.S. Supreme Court has recognized, defendants' only fundamental rights are the right to plead guilty, waive a jury, testify or not, or to take an appeal.[169]

*Red Dog v. State*,[170] for instance, focused

---

157. *Id.* at 663, 104 S.Ct. 2039.

158. *Id.* at 656 n. 17, 104 S.Ct. 2039 (quoting *Jones v. Barnes*, 463 U.S. 745, 758, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983) (Brennan, J., dissenting)).

159. *Id.* at 656 n. 19, 104 S.Ct. 2039 (citations omitted).

160. *Id.*

161. *See Florida v. Nixon*, 543 U.S. 175, 192, 125 S.Ct. 551, 160 L.Ed.2d 565 (2004).

162. *Id.* at 191, 125 S.Ct. 551 (citations and internal brackets omitted).

163. *See id.*

164. 31 Hofstra L.Rev. 913, 1059 (2003) (internal quotations omitted).

165. *See id.*

166. *See, e.g., Nixon*, 543 U.S. at 192, 125 S.Ct. 551; *Dillbeck v. State*, 882 So.2d 969, 975 (Fla.2004).

167. *See Nixon*, 543 U.S. at 187, 125 S.Ct. 551.

168. *Id.*

169. *Id.*

170. *Red Dog v. State*, 620 A.2d 848 (Del.1993).

on a defendant's fundamental right to appeal. In *Red Dog*, counsel attempted to act in the best interest of the defendant by filing an appeal on his behalf—contrary to the defendant's objective.[171] In Red Dog's Motion for Stay of Execution, we held that his counsel acted "in derogation of [the defendant's] express directions to the contrary"[172] because "the decision to pursue or dismiss any application for post-conviction relief ... is [the defendant's] to make."[173] *Red Dog* differs from this case even though in both cases defense counsel diverged from the defendant's "objective." *Red Dog's* defense counsel, however, violated Red Dog's fundamental right to take or refuse to take an appeal. Not so with Cooke, who asserted all of his fundamental rights: he pleaded not guilty, had a trial by jury, testified, and took a direct appeal.[174] Nothing in *Red Dog* supports the Majority's citation to that case for the proposition that beyond entering a not guilty plea, "[t]he decision to pursue a verdict of not guilty and assert his factual innocence belongs to the defendant."

There is at least one capital case where the defendant openly objected to defense counsel conceding his guilt. In *Haynes v. Cain*, Louisiana indicted a defendant for first degree murder and sought the death penalty.[175] Defense counsel concluded that the best trial strategy would be to concede the allegations except for the element of intent to cause death, in order to preserve the defendant's life.[176] That strategy was intended to result in a conviction of second degree murder, thereby avoiding the death penalty.[177] Following the opening statement, the defendant informed the trial judge that he did not agree with defense counsel's strategy.[178] Concluding that excellent attorneys represented the defendant, the judge denied his request for a change of counsel.[179]

Cooke and his counsel's differing views on strategy cannot and do not lead inexorably to the conclusion that he received a "complete denial of counsel," as the majority suggests. Cooke's counsel actively engaged in the pretrial and trial proceedings. They were never absent at any stage of the trial. Cooke not only had access to counsel but also had the discretion to make key decisions at critical stages of the trial. To reiterate: Cooke pleaded not guilty, testified, his counsel cross examined witnesses against him where advantageous, and Cooke filed an appeal.[180] Given what any reasonable person would conclude to be "overwhelming evidence of guilt," Cooke's defense counsel recognized that, "given the strength of the evidence, that ... [Cooke's] guilt was not subject to any reasonable dispute."[181] Given the overwhelming evidence against their client, Cooke's counsel similarly concluded that

171. *Id.* at 848.

172. *Id.* at 852–53.

173. *Id.* at 854 (citing *Smith v. Armontrout,* 857 F.2d 1228, 1229 (8th Cir.1988)).

174. *See Nixon,* 543 U.S. at 187, 125 S.Ct. 551.

175. *See generally Haynes v. Cain,* 149 F.3d 1174 (5th Cir.1998).

176. *Id.*

177. *Id.*

178. *Id.*

179. *Id.*

180. These are the fundamental rights recognized by *Florida v. Nixon,* 543 U.S. 175, 188–89, 125 S.Ct. 551, 160 L.Ed.2d 565 (2004); *see also Brookhart v. Janis,* 384 U.S. 1, 6–7, 86 S.Ct. 1245, 16 L.Ed.2d 314 (1966) (Counsel must have the "constitutional right to plead not guilty and have a trial in which he can confront and cross examine witnesses against him").

181. *See Nixon,* 543 U.S. at 180–81, 125 S.Ct. 551.

"the only way to save [Cooke's] life would be to present extensive mitigation evidence centering on ... mental instability." [182] Although their strategy entailed implicitly conceding guilt, counsel did not prevent Cooke from pleading not guilty, did not waive Cooke's trial rights and did not hinder his right to appeal. Counsel's strategy focused on preserving Cooke's life—the best and only realistic possible result— similar to the strategy counsel employed in *Nixon*.

Although defense counsel's decision to present a GBMI defense constrained them from arguing his innocence, counsel still zealously advocated for Cooke and contested the State's case. Defense counsel filed several pretrial motions to suppress evidence and motions to exclude certain unfairly prejudicial evidence. Defense counsel also filed motions to change venue and to declare the Delaware death penalty statute unconstitutional. During trial, counsel also cross examined witnesses where there may have been merit in doing so, and moved to suppress evidence of an alleged crime that occurred after the murder.

The only instance where defense counsel arguably affirmatively conceded guilt beyond asserting GBMI was through the tes-

timony of Dr. Turner, a psychologist who had evaluated Cooke before trial. Dr. Turner testified that during an interview Cooke had admitted culpability, at least in part. Despite that equivocal testimony, the Majority writes as if the "confession" stood uncontradicted even by Cooke himself during sessions with Dr. Turner. That portrayal is incomplete. Dr. Turner also testified that Cooke told him (Turner) that: he could not believe what he was doing, that he did not remember anything, that he could not believe the victim was dead, and on occasion, Cooke even denied having committed the crimes. Dr. Turner's testimony supported a finding that Cooke was mentally ill, consistent with counsel's GBMI mitigation defense. [183]

We cannot conclude that defense counsel "entirely failed" under any of the factors suggested in *Cronic's* five prongs, because counsel: (1) investigated and prepared the case; (2) were highly experienced capital defense lawyers; (3) lacked any other plausible defenses; (4) and were accessible to Cooke. [184] We, therefore, believe that *Strickland*, not *Cronic*, provides the template for evaluating counsel's performance in order to determine whether Cooke received a fair trial. For those reasons, we cannot agree that defense counsel's strategic actions violated Cooke's Sixth Amend-

---

182. *See id.* ("[Nixon's counsel] concluded that the *best* strategy would be to concede guilt, thereby preserving his credibility in urging leniency during the penalty phase") (emphasis added).

183. The Majority suggests that defense counsel introduced this allegedly damning evidence, "unreachable" by the prosecution without Cooke's waiver of psychoanalyst privilege. We cannot find record support for that conclusion but suggest it is of little consequence because Dr. Turner's testimony about Cooke's "admission" was highly equivocal at best and of no moment given the overwhelming evidence (including Cooke's own testimony), placing him at the scene of the rape and murder.

184. *See U.S. v. Cronic*, 466 U.S. 648, 663–66, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). Even with clear record support for counsel's effort, the Majority cites *Bell v. Cone*, 535 U.S. 685, 696–97, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002) (holding that "the attorney's failure must be complete") and *State v. Carter*, 270 Kan. 426, 14 P.3d 1138, 1146 (2000) (quoting *U.S. v. Swanson*, 943 F.2d 1070, 1071 (9th Cir.1991)) (claiming that "counsel's abandonment of his client's defense [by conceding the only disputed facts in closing argument] caused a breakdown in [the] adversarial system of justice"). Here, counsel did not abandon Cooke's defense; they simply did not pursue Cooke's irrational and unreasonable strategy to pursue innocence.

ment rights. In capital cases that involve overwhelming evidence of guilt and where defense counsel utilizes a strategy that may not frontally support the original not guilty plea, counsel's most effective course might be to force the State to prove guilt beyond a reasonable doubt while at the same time tactically striving to avoid the death penalty.[185] No U.S. Supreme Court opinion holds that that strategy is constitutionally prescribed.

### Death is Different

Capital cases are inherently different from ordinary criminal cases for the obvious reason that death may be the penalty after conviction in the guilt phrase. Death differs from incarceration in two important ways. First, taking the defendant's life is the severest form of punishment. Second, death is irrevocable. These patently clear differences make it essential that the criminal justice system contain adequate safeguards to make certain that the death penalty is carried out only where it is the only appropriate punishment.

One important safeguard is that, unlike ordinary criminal trials, capital cases are tried in two separate proceedings—a guilt phase and a penalty phase.[186] During the guilt phase a jury decides whether the defendant is guilty of the crimes he is charged with having committed.[187] If the jury finds the defendant guilty of a capital crime, the case proceeds to the penalty phase, during which the defendant is on trial for his life.[188] In this phase of the trial, the central issue is "the meaning and value of the defendant's life."[189] That is why the defendant's lawyers are permitted to provide the jury with mitigating evidence of why the jury should spare the defendant's life.[190]

The unique nature of capital cases requires that defense attorneys be given wide discretion to defend their clients in both the inextricably linked guilt and penalty phases as the individual case demands. First, the dual nature of a capital trial forces defense counsel to make strategic choices that are not required in a noncapital criminal case. Second, in a capital case it is far more difficult to discern the client's sincere objectives than in an "ordinary" criminal trial.

The severity and irrevocability of death hangs like a pall over the dual phased capital case proceedings. "The penalty phase of a capital trial differs so greatly from an ordinary criminal trial that the usual standards for assessing competency of counsel in criminal cases are inadequate in death penalty cases."[191] In general, attorneys are ethically bound to try to secure the most favorable possible outcome for their client.[192] In many situations, the guilt of the defendant is so clear beyond a reasonable doubt that an attorney's only option for his client to escape the death penalty is to fix in the jury's minds during the penalty phase a compelling basis for a sentence of life in prison.[193]

185. *See, e.g., id.* at 659, 104 S.Ct. 2039; *Nixon,* 543 U.S. at 191, 125 S.Ct. 551.

186. *See* Gary Goodpaster, *The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases,* 58 N.Y.U.L Rev. 299, 303 (1983).

187. *Id.*

188. *Id.* at 305.

189. *Id.* at 303.

190. *Id.*

191. *Id.* at 304.

192. *Id.* at 319–20; *see also* Russell Stetler, *Commentary on Counsels Duty to Seek and Negotiate a Disposition in Capital Cases,* 31 Hofstra L.Rev. 1157, 1165 (2003) ("The revised ABA Guidelines place proper emphasis on the need to take every possible step towards resolving capital cases for a sentence less than death....").

193. *See* Scott Sunby, *The Capital Jury and Absolution: The Intersection of Trial Strategy,*

In capital cases with overwhelming factual evidence of guilt, attorneys should not be second-guessed for focusing on preserving the defendant's life rather than proving his innocence—irrespective of the defendant's inconsistent demands. Several studies have shown that jurors approach the sentencing phase cynically where counsel's sentencing-phase presentation is logically inconsistent with their earlier guilt-phase defense.[194] Courts that make it extremely difficult for defense counsel to obtain the best realistic outcome for their client, and that bar defense counsel from focusing on sparing a defendant's life, increase the likelihood that the defendant will be sentenced to death.

Courts should also give wide discretion to defense counsel because it is much harder for counsel to discern the true wishes of a client in a death penalty case than in an ordinary criminal case. Given the severity and irrevocability of the death penalty, coupled with the protracted nature of a two phase trial, death penalty cases exact a severe emotional and psychological toll on defendants.[195] This stress, in many cases, "distorts reactions and effects decisions." [196] Capital defense attorneys thus face both the practical and moral difficulty of trying to discern what their clients' actual objectives may be and whether those objectives are rational. Given that difficulty, defense counsel should be accorded wide latitude in determining the best approach to save their clients' lives.

### Applying Cronic's Presumption Would Be Bad Public Policy

If the *Cronic* standard were to be applied to *Cooke*, as the majority has de-clared, then a defendant's death penalty conviction could be overturned on Sixth Amendment grounds without any inquiry being made into counsel's actual performance at trial or into whether counsel's strategic decisions had any effect on the trial's outcome.[197] That result would have several detrimental public policy implications.

First, the *Cronic* standard's economic costs are higher. Where a conviction is overturned, the State must decide whether to drop charges, negotiate a plea, or retry the case. In most death penalty cases where the evidence against the defendant is overwhelming and the nature of the crime is heinous, prosecutors are likely to seek a retrial.[198] Because under *Cronic* no analysis is undertaken to determine if any alleged error on the part of counsel could have or actually did play a substantial role in the defendant's conviction, the State would be forced to retry the cases. Thus, tax payers would effectively pay twice for retrial of cases where the evidence of guilt is so overwhelming that the second trial will almost unquestionably result in the same outcome as the first.

Second, using *Cronic* as a metric for counsel's performance in a case such as this would negatively affect a defendant's ability to obtain the very counsel the Sixth Amendment requires. Not only is the right to counsel constitutionally protected, but also there are important practical reasons why it is required. Our judicial system is designed to "promote the ultimate objective that the guilty be convicted and the innocent go free." [199] The right to

*Remorse, and the Death Penalty*, 83 Cornell L.Rev. 1557, 1589–91 (1998).

194. *See, e.g., id.* at 1589–91; Gary Goodpaster, *The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases*, 58 N.Y.U. L.Rev. 299, 329 (1983).

195. *See* Goodpaster, 58 N.Y.U. L.Rev. at 323.

196. *Id.*

197. *See Bell v. Cone*, 535 U.S. 685, 696–97, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002).

198. *See* Sunby, 83 Cornell L.Rev. at 1589–91.

199. *See Herring v. New York*, 422 U.S. 853, 863, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975).

counsel is important because it helps ensure that innocent individuals are not found guilty simply because they are ignorant of their constitutional rights.[200] The right to counsel mitigates that concern, because "access to counsel's skill and knowledge is necessary to accord defendants the 'ample opportunity to meet the case of the prosecution' to which they are entitled."[201]

The majority's restriction of counsel's strategic options in capital cases would undermine defendants' right to counsel in two important ways. First, attorneys may be unwilling to serve in capital cases because of the intense scrutiny to which they would be subjected. "Intensive scrutiny of counsel and rigid requirements for acceptable assistance could dampen the ardor and impair the independence of defense counsel, discourage the acceptance of assigned cases, and undermine the trust between attorney and client."[202] Finding counsel who are, both willing and able to take on capital cases constitutes a more severe problem than in ordinary criminal cases, because death penalty cases are so fundamentally different. "Capital cases require perceptions, attitudes, preparation, training, and skills that ordinary criminal defense attorneys may lack."[203] Because most attorneys are neither capable of nor willing to handle a capital case, it is essential that the small percentage of attorneys trained in capital cases be willing to accept assignment. If attorneys with the skills to try capital cases are unwilling to do so, it will be difficult for Delaware to ensure that defendants receive adequate counsel.

Even where attorneys are willing to defend capital defendants, there is a danger that the quality of their work could suffer. Defending capital defendants is a difficult job involving long hours, little pay, and extremely difficult decisions. There is a strong possibility that second guessing and criticizing every move that defense attorneys make could lead to systemic demoralization that would adversely effect the effort counsel invest in defending their clients.

We conclude that the Majority applies the wrong standard for scrutinizing counsel's efforts, even though the Majority concedes that the litmus test is: "[w]hether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a **just result**." The majority errs by focusing on counsel's obligation to acquiesce in Cooke's objective, rather than on whether Cooke received a fair trial with reasonably effective assistance of counsel that produced a "just result." Nowhere does the Majority even suggest that a new trial where counsel blindly follows Cooke's irrational position would produce a more "just" outcome. Therefore, we respectfully dissent.

---

200. *See Johnson v. Zerbst*, 304 U.S. 458, 465, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938).

201. *Strickland v. Washington*, 466 U.S. 668, 685, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

202. *Id.* at 690, 104 S.Ct. 2052.

203. Gary Goodpaster, *The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases*, 58 N.Y.U. L.Rev. 299, 303–04 (1983).